622 A.2d 818

**J.A.M. ASSOCIATES OF BALTIMORE, et al.**

**v.**

**WESTERN WORLD INSURANCE COMPANY, INC., et al.**

**No. 1278, Sept. Term, 1992.**

Court of Special Appeals of Maryland.

April 8, 1993.

**696**

Warren K. Kaplan (Pamela L. Sherman and Melrod, Redman & Gartlan, on the brief), Washington, DC, for appellants.

Howard J. Schulman, Baltimore, for appellees, Western World and All Risks, Ltd.

Stanley B. Rohd, Towson, for appellees, John Heller and Ins., Inc.

(Donald C. Allen and Allen Johnson, Alexander & Karp on the brief), Baltimore, for appellee Scottsdale.

Argued before WILNER, C.J., and BISHOP and GARRITY, JJ.

WILNER, Chief Judge.

Appellants, a group of related partnerships or joint ventures, own a considerable amount of property in and around Baltimore City. They relied on Insurance, Inc. and its principal, John Heller, to obtain insurance on those properties.

For the year September 26, 1983 through September 25, 1984, Insurance, Inc. procured that insurance from Western World Insurance Company (Western World), a surplus lines carrier, through Western World's general agent, All Risks Ltd. (All Risks). The 1983–84 policy covered over 1,000 properties, including 72 owned by Capitol Development Limited Partnership, one of the appellants. The policy had a general coverage limit of $300,000 per occurrence with a $500 per occurrence deductible. With respect to lead paint claims, however, it had a $5,000 per occurrence deductible. There was no other coverage limit; nor was there any exclusion for, or other limitation on, lead paint claims.

Insurance, Inc. obtained for appellants, from Western World through All Risks, a renewal policy for 1984–85. There were three relevant changes in that renewal policy, however, which led to this lawsuit. First, the renewal policy did not initially include the 72 properties owned by Capitol Development; second, it not only continued the

$300,000 per occurrence limit but contained as well an aggregate $300,000 limit of liability; third, and most significant, it contained an endorsement excluding "all losses arising out of lead paint poisoning." Appellants contend that these changes were not brought to their attention and that they did not discover them until 1988, when several lead paint claims were made against them and Western World, relying on the exclusion, denied coverage.

Appellants then filed this action in the Circuit Court for Baltimore County against Insurance, Inc., Heller, Western World, and All Risks, seeking reformation of the policy and damages. The reformation they sought was to add the 72 properties of Capitol Development, delete the aggregate $300,000 limit, and remove the lead paint exclusion. The damage claims were based on breach of contract, negligence, negligent misrepresentation, and promissory estoppel. After a non-jury trial, the court entered an order reforming the policy to include the 72 additional properties and to remove the $300,000 aggregate limit.[1] It denied all other significant relief, however, including damages and removal of the lead paint exclusion. When the court then denied appellants' post-judgment request for attorneys' fees, this appeal ensued. Appellants contend that the court erred (1) in refusing to reform the policy to delete the lead paint exclusion, and (2) in denying its request for attorneys' fees. No complaint is made about the disposition of the assorted damage claims. We shall affirm.

### The Lead Paint Exclusion

As we observed, there was no exclusion for lead paint claims in the 1983–84 policy, although there was a considerably higher deductible for those claims. On July 20, 1984,

---

1. It appears that the 72 properties had actually been added to the policy in 1984, when the omission was first brought to Western World's attention. The lingering dispute seemed to be over whether Western World was entitled to charge an additional premium of $1,082. At trial, Western World conceded that it was not entitled to the additional premium and that the initial omission of the 72 properties was an oversight.

Insurance, Inc. wrote to All Risks requesting a renewal of the policy at the same rates, but with the deletion of 102 properties not at issue here. All Risks did not have the authority, on its own, to renew the policy, and so it forwarded the request to Western World. Western World evaluated the request and approved a renewal provided that (1) the premium was increased substantially—from $21,000 to over $46,000, (2) the per occurrence deductible was increased from $500 to $1,000, and (3) lead paint claims were excluded. On September 11, 1984, Western World informed Deanna Deardorff, an employee of All Risks, of these conditions. Ms. Deardorff stated, with some equivocation, that she called Mr. Heller and informed him of the "renewal quote."[2] That same day, she sent a Policy Renewal Notice to Mr. Heller's attention at Insurance, Inc.

The Notice showed the new premium, indicated that there would be a $1,000 deductible per claim, and stated "Lead Poisoning Warranty attached applies to renewal." Attached to the Notice was a proposed endorsement captioned "LEAD POISONING WARRANTY," and stating "This policy excludes claims arising out of the failure, on the part of the insured, to cover all lead based paints on premises insured hereunder." Ms. Deardorff testified that she enclosed that particular endorsement because she believed that it was the form currently used by Western World. In fact, the insurer, some months earlier, had changed its form from a warranty requiring the covering of lead paint to a flat exclusion for lead paint claims, whether the paint was covered or not.

Insurance, Inc. received this material the next day, but it appears that, while Mr. Heller was aware of the increase in the premium and the deductible, he either overlooked the lead paint endorsement or did not believe it to be signifi-

---

**2.** In her initial testimony, Ms. Deardorff said that she had called Mr. Heller but could not remember exactly when she called him. Later, she said that she could not specifically remember calling him but that it would have been her practice to do so.

cant. Heller stated that he did not see the renewal notice itself. On September 26, following a conversation with appellants' office manager, Leslie Ash, Heller wrote to appellants' principal, Max Berg, enclosing an invoice for the renewal at the quoted rate. He called specific attention to the $1,000 deductible but said nothing about the lead paint endorsement. In apparent reference to the much higher premium and deductible, he informed Mr. Berg that "[w]e have thoroughly marketed your renewal and found that most of the insurance carriers would not even provide a premium quotation because of the loss history."[3]

Appellants accepted the offer of renewal, which Insurance, Inc. communicated to All Risks on September 26, 1984. That same day, appellants sent Insurance, Inc. a check for the premium. All Risks then prepared a renewal policy and sent it to Insurance, Inc. on October 4. That policy, as we noted earlier, excluded the 72 properties of Capitol Development, contained an aggregate limit of $300,-000, and included, as Endorsement # 1 on a separate page attached to the back of the policy, a lead paint exclusion. That exclusion, captioned "LEAD POISONING EXCLUSION," was different than the "warranty" that had been included with the September 11 renewal notice; it excluded from coverage "any and all losses arising out of Lead Paint Poisoning." This policy was received by Insurance, Inc. on October 5.

For reasons not entirely clear to us, instead of simply forwarding this policy, which took effect as of September

---

3. Attached to the letter was a summary of the claims filed with respect to the insured properties during the past year. There were 37 such claims, including at least three lead paint claims for which reserves of $25,000, $20,000, and $50,000 had been established.

In deposition testimony admitted at trial, Ms. Ash recalled her conversation with Mr. Heller. She stated that lead paint coverage was of concern to appellants, that Heller stated to her that he was "shopping for insurance policies that would include lead paint coverage," and that he stated that "Western World would provide lead paint coverage." Ms. Ash assumed that the $25,000 increase in premiums was to cover the lead paint coverage.

26, 1984—the date the old policy expired—to appellants, Insurance, Inc. issued a binder to appellants on October 8, 1984. This binder, which stated that it would stand "cancelled when replaced by a policy," contained a limit of $300,000 per occurrence and said nothing about either an aggregate $300,000 limit or the lead paint exclusion. Although the binder showed Western World as the insurer, it is undisputed that Insurance, Inc. had no authority on its own to issue binders for Western World. Insurance, Inc. sent the original policy to appellants on October 19, along with a covering letter that made no mention of the lead paint exclusion.

The evidence indicates that Ms. Ash read through at least part of the policy, for on November 29, 1984, she wrote to Mr. Heller, informing him that some of the partnership names were incorrect. In June, 1985, certain properties were deleted from the policy; a month later, other properties (those of Capital Development) were added. It is evident that the policy had been physically handled by appellants' employees on a number of occasions; it had been unstapled and restapled several times, certain parts had been "whited-out," and the premium figure had been altered by interlineation. Nonetheless, appellants assert that they were unaware of the lead paint endorsement until they submitted some lead paint claims to Western World in 1988 and had them rejected based on the exclusion.

Except as noted in our discussion of their request for attorneys' fees, appellants have confined their complaint in this appeal to the trial court's unwillingness to delete the lead paint exclusion from the policy. They have abandoned their quest for damages from any of the defendants. Our discussion, therefore, will be similarly limited.

In its memorandum opinion, the circuit court, citing *Higgins v. Barnes*, 310 Md. 532, 530 A.2d 724 (1987), noted that reformation of a written contract constitutes extraordinary relief and that, to justify such relief, a heavy burden was placed on the plaintiffs to establish not only fraud, duress, or *mutual* mistake with respect to the existing contract but

also the precise form that the parties intended the contract to take. It concluded from the evidence, which was largely undisputed in this regard, that appellants had failed to show any of those circumstances, and it was on that basis that the relief was denied. The court quickly dismissed any suggestion of fraud or duress, for there was no evidence at all of that; it then concluded that there was no mutual mistake because it was clear that Western World never intended to issue a renewal policy without a lead paint exclusion. The mistake, it held, was in appellants and their chosen agents, Insurance, Inc. and Heller, not reading the policy or the renewal notice, for had they done so they would have known that the new policy was very different from the old.

Appellants do not suggest that there was any fraud on the part of Western World, or any duress on their part. Their argument in this appeal is a dual one.

First, and foremost, they rely on the principle that " 'where an insurer agrees to renew a policy, the insured should have a right to expect that the new protection will be in substance the same as that afforded by the former contract and upon the same conditions.' " *See Government Employees Ins. v. Ropka,* 74 Md.App. 249, 267, 536 A.2d 1214 (1988), quoting from *Couch on Insurance 2d,* § 68.61.

*Ropka* involved a standard automobile insurance policy issued directly by GEICO to one Michael Chilcoat. The policy was first issued in 1970 and was renewed annually thereafter. When the policy was renewed in 1979, there was added to it a "household" exclusion, excluding coverage for bodily injury suffered by any member of Chilcoat's immediate family residing in his household. That exclusion also appeared in the body of the 1980 renewal policy. There was no adjustment in premiums by reason of this exclusion and no separate notice was given of its addition to the policy. In 1982, Mr. Chilcoat, his wife, and his two children were killed in a collision with a truck. Their estates sued the owner of the truck, who filed a third party claim against Chilcoat's estate, claiming that Chilcoat, the driver of his

car, was negligent. GEICO refused to defend on the ground of the household exclusion. The estates urged that the exclusion was void because Chilcoat had not been given proper notice of it.

In considering that issue, we noted, 74 Md.App. at 267, 536 A.2d 1214, that "[m]ost jurisdictions impose an affirmative duty on the insurer to make the insured aware of changes inserted into a renewal policy; absent notice of the change, the insured is entitled to coverage as the original policy stated." The rationale for this rule was stated in *Bauman v. Royal Indemnity Co.*, 36 N.J. 12, 25, 174 A.2d 585, 591–92 (1961):

"When an insured purchases an original policy of insurance he may be expected to read it and the law may fairly impose upon him such restrictions, conditions and limitations as the average insured would ascertain from such reading. However, where the stated period of coverage in the original policy is about to expire and the insurance company simply sends a renewal policy for the new period of coverage, the insured, in all likelihood, will not read it over again and may not fairly be expected to do so. Absent notification that there have been changes in the restrictions, conditions or limitations of the policy, the insured is justly entitled to assume that they remain the same and that his coverage has not in anywise been lessened."

In examining then the question of what sort of notice is sufficient, we surveyed a number of cases throughout the country, all of which involved the direct purchase of insurance by the insured from the insurer and most of which stressed the difficulty ordinary consumers had in spotting changes made in policy provisions absent some clear notice of them. We quoted in that regard from *Canadian Universal Insurance Co. v. Fire Watch, Inc.*, 258 N.W.2d 570, 575 (Minn.1977):

" 'We deem that fairness requires that when an insurer makes basic coverage changes in insurance afforded a long-time insured, it has an obligation to inform the

insured, by cover-letter or a conspicuous heading to the amendatory endorsement, or some similar means, that the endorsement contains significant changes in coverage, and offer to explain and discuss the significance of the changes to the insured upon request.' "

Appleman states a somewhat looser rule, more in keeping with the language from *Bauman, supra*—that "[i]f changes are to be made, it is properly done by simply expressing the changes in the renewal or continuation receipt, or by mailing an endorsement along with the premium notice." 13A Appleman, *Insurance Law and Practice* § 7648 at 457. Continuing, he notes, at 458:

"An insurance agent in renewing a policy is not required to point out to the insured every formal change and linguistic revision. And the insured's broker having accepted a new policy on renewal without ascertaining its terms, the insured has not been permitted to contend, after a loss occurs, that a provision limiting the description should be disregarded. Moreover, while it may be inequitable to require an insured to be aware of a modification by searching the fine print of each renewal policy, *it has been considered appropriate to require that he be aware of a short, separately attached, and boldly worded modification.*"

(Emphasis added.)

■ To a large extent, the requirement of notice proceeds from an ambiguity in the word "renewal," which the public may, with some good reason, regard as synonymous with "extension"—a continuation of the existing policy for another term. Thus, as a matter of fairness and of assuring mutual assent to what is, in reality, a new contract, the law requires that reasonable notice be given to the insured if the insurer intends to make a significant change in the new policy.

■ As was the case in *Ropka*, the question here is not *whether* notice of the change was given, because clearly it was—there was a separate, specific endorsement excluding

coverage. The issue, in terms of the *Ropka* principle, is the *adequacy* of the notice. In that regard, this was not a situation in which appellants expected that the renewal policy would be identical to the one they had. They clearly knew it would not be. They were aware that the premium had more than doubled and that there was to be a $1,000 deductible. That alone should have put them on notice, for, while the $1,000 deductible was double that under the old policy for ordinary claims, it was only 20% of the previous deductible applicable to lead paint claims. The evidence showed that coverage for lead paint claims was of particular concern to appellants. They had been informed by Heller of his inability to place the insurance in the standard market and were aware that they were dealing with a surplus lines carrier. It is not unreasonable, in these circumstances, to expect them to ascertain whether, and to what extent, lead paint coverage was provided.

Appellants had employed an independent agent to handle their insurance, and there can certainly be no doubt that their agent, Insurance, Inc., was informed of the lead paint exclusion. It was informed first, through the renewal notice, that there would be a "warranty" endorsement, which at least restricted coverage. That alone was sufficient to alert the agent that the renewal policy would not be the same in this regard. The renewal notice stated prominently that it was provided as a service to the broker and that it was "the broker's responsibility to review their files and contact every insured concerning their policy renewal." The agent later obtained the actual policy, which it kept for several days before sending to appellants. As we stated in *Mass Transit Admin. v. Granite Constr.*, 57 Md.App. 766, 779, 471 A.2d 1121 (1984), "[i]t is a well-settled rule of agency law that notice to an agent, who has actual or apparent authority to receive it, is binding on his principal."

Apart from the knowledge possessed by Insurance, Inc., there was evidence indicating that appellants themselves should and could have discovered the endorsement. This was a matter of some importance to appellants, given the

three lead paint claims that had been filed in 1983–84. As noted, the exclusion was on a separate page. It was clearly and prominently captioned, in capital letters, "LEAD POISONING EXCLUSION," and it consisted of only one sentence separated by several inches of blank space from any other writing. No one looking at the page could fail to appreciate its significance. Ms. Ash obviously read at least part of the policy, because she noted some errors in it and called them to Insurance, Inc.'s attention. White-outs and interlineations were made to other parts of the policy. And the evidence showed that one or more persons had taken the policy physically apart and re-assembled it more than once. Anyone doing that would have had to come across the lead paint endorsement.

Given all of this evidence, even applying the principle discussed in *Ropka*, it is clear that sufficient notice of the change was given by Western World and All Risks to appellants. There was no mutual mistake, and appellants had no right to assume that the renewal policy did not contain a lead paint exclusion. The only conceivable basis for a contrary reliance would have been the binder sent to appellants by Insurance, Inc., but, as noted, that binder did not come from, and was never authorized by, Western World or All Risks, and indeed it was issued after Insurance, Inc. had received the actual policy. The court did not err in refusing to reform the policy to delete the lead paint exclusion.

A second theory asserted by appellants in favor of reformation is what they call a "contract analysis." The renewal notice sent by All Risks to Insurance, Inc. on September 11, 1984 contained a proposed "lead poisoning warranty" endorsement excluding claims based on the insured's failure to "cover all lead based paints." That, appellants maintain, is quite different from the exclusion actually inserted in the policy. They regard the renewal notice as an offer which they accepted on September 26, when they paid the premium to Insurance, Inc. Thus, they claim that they are entitled to a policy consistent with that contract.

The problem with this theory is that it was not the basis upon which relief was sought below. In their complaint, and during the trial, appellants did not ask that the warranty endorsement be substituted for the exclusion endorsement. Their quest for reformation was limited to conforming the 1984–85 policy to the 1983–84 policy.

In their complaint, appellants took the position that Insurance, Inc. was *Western World's* agent, not theirs, and they thus charged Western World with responsibility for Insurance, Inc.'s conduct. In paragraph 13, for example, they contended that Western World, through

"its authorized agent Insurance, Inc. made oral representations to Plaintiffs that Western World agreed to renew the 1983–84 Policy for an additional year *on the same terms and conditions* except that: (1) the total advance premium was increased from $21,900.00 to $46,375.00; and (2) the $500.00 per year occurrence deductible would be increased to $1,000 per occurrence."

(Emphasis added.) In paragraphs 16 and 17, they referred to the September 26 letter from Insurance, Inc., again alleged to be Western World's agent, asserting that that letter "confirmed the agreement and understanding between Western World and Plaintiffs that the renewal policy for 1984–85 ... *would provide the same terms and conditions to Plaintiffs as was provided under the 1983–84 Policy,* except [the increase in premiums and the increased deductible]." In paragraphs 20 and 21, they alleged that Insurance, Inc., as Western World's agent, issued a renewal binder on October 8, and that the binder "confirmed that Western World had extended coverage to Plaintiffs in accordance with the expiring 1983–84 Policy...."

Consistent with that view, appellants asked in Count I of their complaint that the court reform the policy by "deleting the reference to 'Endt. # 1' [the lead paint exclusion] in Item 1 of the Declarations in its entirety" and by "amending the WWI deductible endorsement by inserting the sum and phrase '$5,000.00 LEAD PAINT DEDUCTIBLE' above the provision 'Amount $1,000.00 per claim.' " That is all the

relief requested with respect to the lead paint exclusion—to make the 1984–85 policy identical to the 1983–84 policy.

The case was tried in accordance with these averments and requests. Not until after trial was concluded did appellants, in their submission of Proposed Findings of Fact and Conclusions of Law, first assert that Insurance, Inc. was an "intermediary between insureds ... and insurance carriers or general agents," rather than an agent of Western World, and present this "contract analysis" as a basis for the alternative relief of substituting the warranty endorsement for the exclusion. That, of course, represented a dramatic change not only in the relief sought but in the theory for any reformation of the policy. The court did not address that theory in its opinion, except to the extent that it found Insurance, Inc. to be "acting on behalf of the Plaintiffs...."

■ Whatever merit this new theory may have—and we do not suggest that it has any—we do not believe appellants are entitled to a reversal, or a remand, based on it. A party cannot be allowed to plead and try a case on one theory, inject another, inconsistent one after the case is closed, and then seek reversal when the trial court fails to decide the case based on the new theory.

### Attorneys' Fees

■ Upon receipt of the court's memorandum opinion and order, appellants filed a motion for revision under Md. Rule 2–535(a), seeking attorneys' fees for what they regarded as the successful prosecution of their action. This was based on the doctrine, recognized in *Bankers & Ship. Ins. v. Electro Enter.*, 287 Md. 641, 648, 415 A.2d 278 (1980) and other cases, that if an insurer breaches its contractual duty to defend against a claim potentially within the coverage of the policy, it is liable to the insured for attorneys' fees expended by the insured not only in defending the claim but also in defending or prosecuting a declaratory judgment proceeding brought to determine coverage or the duty to

defend.  Appellants' theory was that its action to reform the policy was successful with respect to two of the three requests for reformation—the addition of the 72 properties of Capitol Development and deletion of the aggregate $300,-000 limit.  Accordingly, they believed that they were entitled to attorneys' fees incurred in prosecuting that action.

After a hearing, the court denied the request.  It noted first that the omission of the 72 properties was inadvertent and that, when the omission was brought to the insurer's attention, the properties were added to the policy.  A lawsuit was not necessary to restore the properties.  The only item in dispute as to that was the fact that the insurer had charged a $1,082 premium for the properties which the court ultimately determined was improper.  The deletion of the $300,000 aggregate limit, the court held, would have had significance, and would have justified the award of attorneys' fees, if the lead paint exclusion had also been deleted.  With that exclusion intact, however, the deletion of the aggregate limit had no importance because the only claims against the policy were lead paint claims that were not covered in any event.  The "victory" with respect to the liability limit was therefore not only hollow but entirely meaningless.

We agree entirely with the court's reasoning and its conclusion, and therefore do not need to address whether the entitlement to attorneys' fees in a declaratory judgment action to enforce compliance with a policy applies as well to an action to reform the policy, i.e., to *change*, rather than *construe*, the policy provisions.

JUDGMENT AFFIRMED;

APPELLANTS TO PAY THE COSTS.