[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
Memorandum Filed September 4, 1996
Procedural Background
On August 16, 1995, the plaintiff, Peerless Insurance Co. (Peerless), filed a complaint seeking a declaratory judgment against the defendants, Leonnela Gonzalez, Jefferson Street Medical Building Inc. (JSMB), Aaron Friedman and Dennis Angel in this case. Peerless seeks a declaration that it not be required to defend or indemnify in connection with lead paint-related injuries allegedly sustained by Gonzalez, a minor child, when she lived at 177 Retreat Avenue in Hartford. Peerless alleges that CT Page 5510 the building in which Gonzalez lived is owned by Friedman and Angel. The injuries caused to Gonzalez are the subject of the complaint in a consolidated action currently pending, entitledLeonnela Gonzalez, a Minor Child, by Her Mother and Next Friend,as Prochein Ami, Wilda Correa v. Jefferson Street MedicalBuilding, Inc., Aaron Friedman, and Dennis Angel, Superior Court, judicial district of Hartford-New Britain, at New Britain, Docket No. 467121 (the underlying action).
In the underlying action, Leonnela Gonzalez alleges that she and her mother leased and occupied an apartment at 177 Retreat Avenue, and that during her residency there, she was exposed to toxic levels of lead contained in lead paint.[1] Gonzalez alleges a variety of causes of action and injuries in her complaint. The complaint in the underlying action alleges that defendants Friedman and Angel were at all relevant time periods the owners of record, landlords and otherwise in control of the premises at 177 Retreat Avenue.
At the time of Gonzalez's residence at 177 Retreat Avenue, American Realty, c/o Friedman and Angel, carried an insurance policy, policy number BOP4300466, issued by Peerless, covering the premises. Peerless has brought the current action seeking to enforce a policy exclusion, which, it claims, excludes injuries caused by lead. It is undisputed that at all relevant time periods, the insurance policy at issue, including the "lead exclusion" provision at issue, was in effect.
On December 20, 1995, Peerless filed a motion for summary judgment, dated December 19, 1995, accompanied by a memorandum of law, a copy of the summons and complaint from the underlying action, the affidavit of Ann Saller, a claims representative from Peerless, and a copy of the insurance policy covering 177 Retreat Avenue.
On January 5, 1996, Friedman, Angel and American Realty filed a memorandum of law in opposition to the motion for summary judgment. On January 12, 1996, a memorandum of law in opposition to the motion was filed by defendant Jefferson Street Medical Building. On February 7, 1996, Gonzalez filed a memorandum of law in opposition to the motion.
On May 17, 1996, Peerless filed a memorandum in response to the defendant's objection to the motion for summary judgment. On May 20, 1996, Gonzalez filed a supplemental memorandum of law in CT Page 5511 opposition to the motion for summary judgment. The supplemental memorandum was accompanied by a copy of Nationwide Mutual Ins.Co. v. Cisneros, 52 F.3d 1351 (6th Cir. 1995), and the affidavit of Gonzalez's attorney, John-Henry M. Steele. On June 5, 1996, Peerless filed a reply to Gonzalez's supplemental memorandum of law.
Preliminary analysis of the issues in the case persuaded me that additional input from counsel was required. Consequently, pursuant to an order dated July 17, 1996, the Court ordered the parties to make additional written submissions. Those submissions have now been received and reviewed in light of the previous memoranda filed and the full record in the case. For the reasons stated, plaintiff's motion for summary judgment is granted.
LEGAL DISCUSSION
Pursuant to our rules of practice and extensive case law, it is well-established that a party seeking summary judgment bears a heavy burden to prevail. Practice Book Sections 378-386.
Summary judgment should be rendered only if "the pleadings, affidavits and any other proof submitted show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." (Internal quotation marks omitted.) Home Ins. Co. v. Aetna Life Casualty Co.,235 Conn. 185, 202, 662 A.2d 1001 (1995). The function of the trial court "is only to determine whether there is a genuine issue as to any material fact, but not to decide that issue if it does exist until the parties are afforded a full hearing . . ." Yanowv. Teal Industries, Inc., 178 Conn. 262, 269, 422 A.2d 311
(1979). "In deciding on a motion for summary judgment, the trial court must view the evidence in the light most favorable to the nonmoving party . . ." (Internal quotation marks omitted.) Suarezv. Dickmont Plastics Corp., 229 Conn. 99, 105-06, 639 A.2d 507
(1994). The test for summary judgment is "whether the moving party would be entitled to a directed verdict on the same facts."Wilson v. New Haven, 213 Conn. 277, 279-80, 567 A.2d 829 (1989). Summary judgment is designed to "eliminate the delay and expense incident to a trial where there is no real issue to be tried."Mac's Car City, Inc. v. American National Bank, 205 Conn. 255,261, 532 A.2d 1302 (1987). "[A] party opposing summary judgment must substantiate its adverse claim by showing that there is a genuine issue of material fact together with the evidence disclosing the existence of such an issue . . . It is not enough, CT Page 5512 however, for the opposing party merely to assert the existence of such a disputed issue. Mere assertions of fact . . . are insufficient to establish the existence of a material fact and, therefore, cannot refute evidence properly presented to the court [in support of a motion for summary judgment]." (Citation omitted; internal quotation marks omitted.) Home Ins. Co. v.Aetna Life Casualty Co., supra, 235 Conn. 202.
Peerless has moved for summary judgment on the ground that the injuries alleged in the underlying action resulted from the "use or existence of, exposure to or contact with lead or lead contained in goods, products or materials," and, as such, are excluded under the plain language of the policy. (See December 19, 1995, Memorandum in Support of Motion for Summary Judgment, at page 7.)
The policy in question in the underlying action provides the following in relevant part:
 THIS ENDORSEMENT CHANGES THIS POLICY. PLEASE READ IT CAREFULLY.
LEAD EXCLUSION
This endorsement modifies insurance provided under the following:
COMMERCIAL GENERAL LIABILITY COVERAGE FORM
COMMERCIAL PROTECTOR LIABILITY COVERAGE FORM
INDIPACK LIABILITY COVERAGE FORM
COMPREHENSIVE CONTRACTORS POLICY
A. This insurance does not apply:
 To Bodily Injury, Property Damage or Personal Injury arising in whole or in part out of the mining, processing, manufacture, storage, distribution, sale, installation, removal, disposal, handling, use or existence of, exposure to, or contact with lead or lead contained in goods, products or materials . . ."[2]
Peerless maintains that this language is clear and CT Page 5513 unambiguous and that it expressly provides that coverage is excluded for bodily injury, property damage, or personal injury resulting from any contact with or exposure to lead. Peerless contends that in the underlying action, the plaintiff, Leonnela Gonzalez specifically alleges that her injuries were caused by exposure to lead paint located on the subject premises. Peerless argues that insurance policies excluding injuries due to lead exposure have been upheld in other jurisdictions. J.A.M. Assoc.of Baltimore v. Western World Ins. Co., Inc., 95 Md. App. 695,622 A.2d 818 (1993).
In response, the defendants Aaron Friedman, Dennis Angel, and Jefferson Street Medical Building put forth a number of arguments. First, they argue that the lead exclusion does not apply to premises liability incurred by a landlord, but instead it only applies to industrial lead exposure. The defendants cite the policy language referring to the "mining, processing, manufacture, storage, distribution, sale, installation, removal, disposal, handling . . ." of lead in support of this argument. Friedman and Angel cite General Accident Ins. Co. v. Idbar RealtyCorp., 622 N.Y.S.2d 417 (Sup.Ct. 1994), in which the court held that a "pollution exclusion" was inapplicable to lead paint-related injuries, even if lead were considered "pollution," because the exclusion could reasonably be interpreted to apply only to injuries caused by "industrial environmental pollution."General Accident Ins. Co. v. Idbar Realty Corp., supra,
622 N.Y.S.2d 419-20. Friedman and Angel contend that the policy upheld in General Accident Ins. Co. is consistent with that at issue here, and that a plain reading of the exclusion in the present case could reasonably have led the defendants to believe the exclusion applied only to industries dealing with lead as part of their operations. Defendant Jefferson Street Medical Building also relies on this argument. Second, Friedman and Angel argue that Gonzalez's complaint alleges "multiple theories of liability," some of which could potentially result in liability not within the scope of the lead exclusion. Friedman and Angel take the position that J.A.M. Assoc., supra, is distinguishable from the underlying action because in J.A.M. Assoc., the policy exclusion which was upheld included the words "lead paint." They argue that the exclusion at issue in the present case merely mentions "lead or lead contained in goods, products or materials . . ." (Peerless Policy No. BOP4300466.) Finally, they dispute that lead paint is a "good," "product," or "material" under the policy at issue. CT Page 5514
Gonzalez also makes a number of arguments in opposition to the motion for summary judgment. Gonzalez argues that the exclusion does not explicitly exclude claims for lead paint-based related injuries. Gonzalez contends that J.A.M. Assoc., supra,
demonstrates that insurers were writing specific exclusions for lead paint claims as early as 1984, and that if Peerless had intended to include lead paint in the policy exclusion, it could have done so explicitly. Gonzalez further argues that there is a genuine issue of material fact concerning whether lead paint is a "good, product or material" under the policy language at issue. Finally, Gonzalez contends that if the exclusion were to apply to lead paint, such an interpretation would violate the express public policy of the Federal Fair Housing Act as interpreted by the United States Department of Housing and Urban Development (HUD). According to 24 C.F.R. § 100.70(d)(4), it is unlawful to "provide municipal services or property or hazard insurance for dwellings or provide such services differently because of race, color, religion, sex, familial status, or national origin." Gonzalez argues that if the exclusion is applied to lead paint, it will constitute discrimination based upon familial status against people who live in certain areas.[3]
LEGAL ANALYSIS
Having considered the arguments of the defendants in opposition to the motion for summary judgment. I have concluded that none of them withstand analysis.
The question of whether an insurer has a duty to defend and/or indemnify an action brought against its insured requires analysis of the allegations in the complaint filed against the insured and a determination of whether the complaint states facts which appear to bring the alleged injury within the coverage of the policy issued. Missionaries of the Company of May, Inc. v.Aetna Casualty and Surety Co., 155 Conn. 104, 110 230 A.2d 21
(1967). The function of the trial court in a declaratory judgment action is to ascertain the rights of the parties under existing law. Halpern v. Board of Education, 196 Conn. 647, 654-55 (1985). Declaratory judgments have been frequently used to determine the rights and liabilities of parties under insurance policies. SeeShelby Mutual Insurance Company v. Williams, 152 Conn. 178, 179
(1965).
In undertaking the required analysis, it is the court's responsibility to review the provisions of the insurance contract CT Page 5515 at issue. Gottesman v. Aetna Ins. Co., 177 Conn. 631, 634,418 A.2d 944 (1979). Where the terms of a policy are "clear and unambiguous," there is no room for construction. Flint v.Universal Machine Co., 238 Conn. 637 (1996). A contract of insurance "must be viewed in its entirety, and the intent of the parties for entering it derived from the four corners of the policy." Id., at 643. See also Cox v. Peerless Ins. Co.,774 F. Sup. 83, 86 (D.Conn. 1991). A court should avoid ingenious readings of contractual language and microscopic analysis to conjure up ambiguities where none exist. A certain unavoidable degree of ambiguity is inherent in almost all contractual provisions, indeed, all language. In evaluating the intentions of the parties as expressed in the language used in a contractual provision, the focus is not simply on whether more precise language could have been used, but whether the language that was used is ambiguous when fairly read.
"A court will not torture words to import ambiguity where the ordinary meaning leaves no room for ambiguity, and words do not become ambiguous simply because lawyers or laymen contend for different meanings." (Internal quotation marks omitted.) Schultzv. Hartford Fire Ins. Co., 213 Conn. 696, 703, 569 A.2d 1131
(1990).
"Although ordinarily the question of contractual intent presents a question of fact for the ultimate fact finder, where the language is clear and unambiguous it becomes a question of law for the court . . . When the plain meaning and intent of the language is clear, a clause . . . cannot be enlarged by construction. There is no room for construction where the terms of a writing are plain and unambiguous, and it is to be given effect according to its language." Rapaport Benedict PC. v.Stamford, 39 Conn. App. 492, 499, 664 A.2d 1193 (1995); See alsoHammer v. Lumberman's Mutual Casualty Co., 214 Conn. 573, 583,573 A.2d 699 (1990) ("If the words in the policy are plain and unambiguous the established rules for the construction of contracts apply, the language, from which the intention of the parties is to be deduced, must be accorded its natural and ordinary meaning, and courts cannot indulge in a forced construction ignoring provisions or so distorting them as to accord a meaning other than that evidently intended by the parties").
As a preliminary matter, the court rejects the argument that the language at issue can fairly be read to apply only to the CT Page 5516 industrial uses of lead. To be sure, the language of the lead exclusion provision suggests it may embrace situations associated with the industrial use of lead insofar as it states that the insurance does not apply to defined injuries "arising in whole or in part out of the mining, processing, manufacture, storage, distribution, sale, installation, removal, disposal [and] handling" of "lead or lead contained in goods, products or materials." But the provision also plainly states that the insurance does not apply to bodily injury "arising in whole or in part out of . . . use or existence of, exposure to, or contact with lead or lead contained in goods, products or materials . . ." This language is clear, unambiguous and broad in its sweep. No similar language was found in the policy at issue in General Accident Ins. Co. v. Idbar Realty Corp., on which defendants rely. That the first portion of the language of exclusion may relate to industrial uses does not render the reach of the rest of the provision any narrower. None of the cases cited by defendants, in my view, suggest a different conclusion.
A more persuasive argument, on its surface, is the claim that the language is ambiguous because it does not explicitly include the words "lead paint" in the language of exclusion, as was the case in the provision at issue in J.A.M. Assoc. of Baltimore v.Western World Ins. Co., 95 Md. App. 695, 622 A.2d 818 (1993). This argument is made in light of the "basic principle of insurance law that policy language will be construed as laymen would understand it and not according to the interpretation of sophisticated underwriters, and that ambiguities in contract documents are resolved against the party responsible for its drafting; the policyholder's expectations should be protected as long as they are objectively reasonable from the layman's point of view . . . The premise behind the rule is simple. The party who actually does the writing of an instrument will presumably be guided by his own interests and goals in the transaction. He may choose shadings of expression, words more specific or more imprecise, according to the dictates of these interests . . . A further, related rationale for the rule is that [s]ince one who speaks or writes, can by exactness of expression more easily prevent mistakes in meaning, than one with whom he is dealing, doubts arising from ambiguity are resolved in favor of the latter." (Citations omitted: internal quotation marks omitted.)O'Brien v. United States Fidelity Guaranty Co., 235 Conn. 837,843, (1966); see also Stephen v. Pennsylvania General Ins. Co.,224 Conn. 758, 763, 621 A.2d 258 (1993) ("Under well established rules of construction, any ambiguity in the terms of an insurance CT Page 5517 policy must be considered in favor of the insured because the insurance company drafted the policy.") Stephen v. PennsylvaniaGeneral Ins. Co., 224 Conn. 758, 763, 621 A.2d 258 (1993).
In light of these important general considerations, courts have traditionally, and with extremely good reason, disfavored policy exclusions. "Where particular provisions, if read literally, would largely nullify the insurance, they will be severely restricted so as to enable fair fulfillment of the stated policy objective." Search EDP, Inc. v. American HomeAssurance Co., 632 A.2d 286, 290 (N.J.Super A.D. 1993). "Under familiar rules of construction, any uncertainties in an insurance policy will be resolved in favor of imposing liability. This is particularly so in the case of exclusions, since the burden rests on the insurer to phrase exceptions and exclusions in clear and unmistakable language." California Comp. Fire Co. v. IndustrialAcc. Com'n, 399 P.2d 381, 383 (Cal., 1965). "[E]xceptions from coverage are to be strictly construed against the insurer when their application is doubtful." Webb v. Allstate Life Ins. Co.,536 F.2d 336, 340 (10th Cir., 1976).
But as noted above, a court can find ambiguities in contract language only where a reasonable reading of the language at issue discloses ambiguity. General language can almost always be made more specific. "An insurance policy is to be interpreted by the same general rules that the construction of any written contract and enforced in accordance with the real intent of the parties as expressed in the language employed in the policy . . . The policy words must be accorded their natural and ordinary meaning . . ."Stephen v. Pennsylvania General Ins. Co., 224 Conn. 758, 763,621 A.2d 258 (1993).
In this case, while it is true that most of the terms at issue are not defined in the policy itself, I have concluded that ambiguity can be found only through a strained and tortured reading of the plain language of the provision at issue. The policy language clearly and unambiguously states that the subject insurance does not relate to "bodily injury"[4] arising "in whole or in part out of . . . use or existence of, exposure to, or contact with lead or lead contained in goods, products ormaterials."
In Webster's Ninth New Collegiate Dictionary, "goods" are defined as "personal property having intrinsic value but usu. excluding money, securities and negotiable instruments." In CT Page 5518 Black's Law Dictionary (5th ed. 1979), "goods" are defined as "[items] of merchandise, supplies, raw materials, or finished goods. Sometimes the meaning of `goods' is extended to include all tangible items, as in the phrase `goods and services.'" "Goods" are defined by General Statutes Section 42a-2-105(1) for commercial purposes as "all things, including specially manufactured goods, which are moveable at the time of identification to the contract." Incomm, Inc. v. Thermo-Spa,Inc., 41 Conn. Sup. 566, 569, 595 A.2d 954 (1991). I conclude that "lead paint" is included within the definition of "lead contained in goods" as it relates to the exclusionary language in this case.
I also conclude that, for purposes of this case, "lead paint" is subsumed within the definition of "lead contained in . . . products . . ." A "product" is succinctly defined in Webster's Ninth New Collegiate Dictionary as "something produced." In Black's Law Dictionary (5th ed. 1979), product is defined to mean "something produced by physical labor or intellectual effort or something produced naturally or as a result of natural process as by generation or growth." In the case of Bobryk v. LincolnAmusements, Inc., Superior Court, judicial district of Hartford-New Britain at Hartford, Docket No. 547084, 15 CONN. L. RPTR. 617 (January 5, 1996) (Sheldon, J.), "product" is defined as "any item, thing or commodity which, upon acquiring its physical existence and identity, through the process of manufacture or otherwise, is put in the stream of commerce either by sale, for use, consumption or resale, or by lease or bailment." See also Hydro Systems v. Continental Insurance,929 F.2d 742, 744 (9th Cir. 1991).
I conclude, finally, that lead paint is included within the definition of "lead contained in . . . materials" as well. Webster's Ninth New Collegiate Dictionary defines "material" as "the elements, constituents or substances of which something is composed or can be made." See also Mutual Lumber Co. v. Sheppard,173 S.W.2d 494, 498 (Tex.Civ.App. 1943) ("Material" means the substance of which anything is made); Terteling Bros. v. Glander,85 N.E.2d 379, 383 (Supreme Court of Ohio 1949); Ellis v.Cochran, 28 S.W. 243, 244 (Tex.Civ.App. 1894) (The word "materials" is constantly and commonly used to designate any article employed in the erection and completion of buildings. It includes paints and oils clearly as it includes lumber, sash, doors, blinds, and other things commonly called "building materials").[5]
CT Page 5519
Finally, Friedman, Angel and American Realty argue that ". . . even if the Lead Exchange does not apply to such liability Peerless is still required to provide the defendants with a defense, because there are multiple theories of liability alleged in Ms. Gonzalez's complaint, some of which, if proven, could result in liability clearly not within the scope of the Lead Exclusion." Pursuant to the July 17, 1996, order, the court required defendants Friedman, Angel and American Realty to identify in writing what "multiple theories of liability" they were referring to, with specific reference to the complaint in the underlying action. In their Supplemental Memorandum dated August 9, 1996, these defendants point to paragraph 6 of the First Count of the March 28, 1995 complaint, noting that it alleges "several statutory violations by the Defendants, and therefore sets forth multiple theories of liability," and they specifically point to the alleged violation of General Statutes Section 47a-54f which, they contend, "clearly does not require a plaintiff to prove the presence of lead in paint."[6] They claim that in light of the language of 47a-54f, "a trier of fact could find the Defendants liable to Ms. Gonzalez but not find that there was lead present at the premises." They further point to the allegation, also in paragraph 6 of the First Count, that defendants have violated General Statutes Section 19a-111c as demonstrating that liability could exist notwithstanding the lead exclusion.[7]
Examination of the these statutory allegations in the context of the language used in the underlying complaint, however, undermines defendants' arguments that there are "multiple theories of liability" not dependent upon a lead paint-based theory.
Paragraph 5 of the First Count makes reference to Ms. Correa and her minor child being exposed to "dangerous, hazardous and toxic levels of lead paint . . . on the interior and exterior surfaces of 177 Retreat Avenue causing Ms. Correa's minor child to suffer injuries and losses."
Paragraph 6(a)'s reference to Section 47a-54f must be read in the context of the allegations made in Paragraph 5 as an embellishment and extension of the allegations in Paragraph 5. As such, while Section 47a-54f(b) itself makes no reference to "lead paint," this statutory allegation, read fairly and in context, is clearly a reference to a lead paint-related allegation of injury. CT Page 5520 The fact that Paragraph 6(b) and (c) specifically refer to alleged failures to inspect for toxic levels of lead paint and failure to properly "de-lead" 177 Retreat Avenue buttresses this conclusion. So, significantly, does the language of Paragraph 7 of the Complaint, which alleges as follows:
 7. As a result of the Defendant's wrongful acts and omissions as set forth in Paragraph 6 above, Ms. Correa's minor child became lead poisoned, and has suffered one or more of the following serious and/or painful injuries and losses, some or all of which may be permanent . . . (Emphasis added).
Defendants' argument that Section 19a-111c sets out a "multiple theory of liability" apart from one based on a lead paint-related allegation is likewise unpersuasive. By its very title and terms, that section relates to paint containing "toxic levels of lead . . ."
Review of the allegations contained in the other counts of the complaint confirms that, no matter how it is creatively characterized, the complaint is based on allegations relating to injuries alleged to have been caused by exposure to paint containing lead.
Cases such as this one present significant issues of importance to the litigants and the community. Each case must be decided on its own facts in light of the precise policy language involved. In this case, I have concluded that Peerless has no duty to indemnify or defend defendants for the reasons stated above. Therefore, plaintiff's Motion for Summary Judgment dated December 19, 1995, is granted.
LAVINE, J.