730 A.2d 428

**CIGNA PROPERTY AND CASUALTY COMPANIES et al.**

v.

**Klaus ZEITLER.**

**No. 750, Sept. Term, 1998.**

Court of Special Appeals of Maryland.

May 27, 1999.

Michael S. DeBaugh (J. Paul Mullen and Lord & Whip, P.A., on the brief), Baltimore, for appellant Cigna.

David J. McManus and Mark A. DiAntonio (Baxter, Baker, Sidle & Conn, P.A., on the brief), Baltimore, for appellant, Jack Martin.

Steven R. Migdal ( Buck, Migdal & Myers, Chartered, on the brief), Annapolis, for appellee.

Argued before HARRELL, HOLLANDER and BYRNES, JJ.

HOLLANDER, Judge.

On September 4, 1995, Hurricane Luis stormed through the Caribbean island of St. Maarten, severely damaging the *Serefe*, a forty-seven foot Tayana Auxiliary Cutter owned by Dr. Klaus Zeitler, appellee. At the time of the occurrence, appellee believed his yacht was covered by a marine insurance policy issued by CIGNA Property and Casualty Companies ("CIGNA"), appellant, and procured by Jack Martin & Associates, Inc. ("JMA"), appellant, an insurance agency located in Annapolis. On November 8, 1995, CIGNA denied appellant's claim for the loss of the vessel, because the insurance policy did not provide coverage in Caribbean waters after July 1, 1995, when the hurricane season commences.

On April 8, 1996, Zeitler instituted suit in the Circuit Court for Anne Arundel County against CIGNA and JMA, alleging breach of contract and negligence.[1]  A jury returned a verdict in favor of Dr. Zeitler, and awarded damages against both appellants in the amount of $200,329.74.  After the court denied appellants' motions for judgment notwithstanding the verdict, appellants timely noted their appeals.  They present numerous issues for our consideration, some of which overlap. We have condensed, rephrased, and reordered their questions as follows:

I.   Did the trial court err in submitting appellee's negligence count against JMA to the jury in the absence of expert testimony regarding the duty of care owed to a client by a professional insurance agent?

II.  Did the trial court err in concluding that CIGNA was required to notify appellee of the new terms contained in his 1994–1995 policy, pursuant to COMAR 09.30.32?

III. Were appellants entitled to judgment as a matter of law because of appellee's failure to read the insurance binder and the insurance policy?

For the reasons that follow, we perceive no error.  Therefore, we shall affirm.

### Factual Background

Dr. Zeitler, a citizen of Canada, purchased the *Serefe* in May 1991.  When the yacht was damaged by the storm, he was employed as chief executive officer of a Canadian mining corporation based in Toronto.  Although appellant resided in Toronto, he harbored the vessel in Annapolis with Paradise Bay Yacht Charters, Inc. ("Paradise Bay").  Paradise Bay maintained the boat, offsetting the cost of its services by including the boat in its charter fleet.  Although Dr. Zeitler received a portion of the fees generated by charter use, he retained the right to use the vessel at his convenience, with

---

1. Appellants have not attempted to blame each other, either by cross-claim or argument, in regard to appellee's claim.

prior notice to Paradise Bay. JMA acted as the insurance broker for the vessels in the Paradise Bay fleet.

At the time of purchase, the vessel was covered under a CIGNA policy held by the previous owner and arranged through JMA. On June 10, 1991, shortly after Dr. Zeitler acquired the vessel, he signed a "Watercraft Application" by which appellee instructed JMA to obtain insurance. The application advised that Dr. Zeitler's coverage would be under a CIGNA policy that was in effect from November 1, 1990 through November 1, 1991. According to appellee's trial testimony, he paid $992 in premiums from June 10, 1991 until the end of the policy period.

Ordinarily, insurance policies for the Paradise Bay fleet ran from November 1 of each year through November 1 of the following year. Sometime prior to November 1, 1991, JMA sent a letter to Dr. Zeitler at his Toronto address, advising him that his current policy was about to expire, and that JMA had "taken the liberty of remarketing the [insurance] policy to provide the most complete coverage at the most competitive rate." For the renewal year beginning on November 1, 1991 and continuing through November 1, 1992, JMA placed appellant's coverage with Maryland Casualty Company, rather than CIGNA. Although JMA informed appellee that his policy would be placed with a different insurer, the letter referred to his November 1991 through November 1992 application as a "renewal" application. JMA's letter stated:

Your coverage has been placed with Maryland Casualty Company. Enclosed you will find your renewal policy, an invoice for your renewal premium as well as a Renewal Application. Please read the policy carefully, make any necessary changes and return the signed application with your payment.

A statement at the bottom of the page provided:

It is important that we have the Renewal Application completed and returned to our office. Up to date information allows me to select appropriate coverage for your yacht at the lowest premium cost.

In November 1992, JMA chose not to "renew" coverage through Maryland Casualty. Instead, it returned to CIGNA. The *Serefe* was insured through CIGNA until the boat was damaged in 1995.

In renewal year 1991–1992, the "Navigation Zone" specified on appellee's renewal application was the "Chesapeake Bay and tributaries." At trial, Dr. Zeitler testified that, prior to renewal year 1992, he informed JMA that he wished to sail in the Caribbean. Accordingly, the "Navigation Zone" on appellee's application for November 1992 through November 1993 was changed to the "Atlantic including Bahamas, Bermuda, Virgin Islands." In an October 22, 1992 cover letter to appellee accompanying the 1992–1993 "renewal", JMA agent Peggy Brookman added the following note at the bottom of the page: "Have a Safe Trip to the Islands!" [2]

The following year, appellee's "Navigation Zone" was again expanded. A "Certificate of Insurance" dated October 19, 1993 contained the following "Navigational Warranty": "Atlantic Coast from Eastport, ME to Cedar Key, FL including the Caribbean Box; 9–19 degrees North to 58–73 degrees West and all transits in between." Significantly, the 1993–1994 policy contained no limitation as to the dates of travel in the Caribbean.

In October 1994, a representative of Paradise Bay informed Morgan Wells, a marine insurance agent with JMA, that JMA should not include the *Serefe* among the Paradise Bay vessels insured under the fleet policy for 1994–1995. Thereafter, JMA negotiated with CIGNA to obtain a private pleasure policy to cover the *Serefe*. On October 21, 1994, Wells sent the following facsimile to CIGNA:

---

2. According to Bookman's letter, appellant's vessel was insured "with the Paradise Bay Fleet" under a "fleet policy." We do not have a copy of the 1992–1993 policy in the record, but we infer that individual owners within the Paradise Bay fleet were permitted under the policy to alter the terms of the "fleet" insurance as it related to their vessels.

Following account is under Paradise Bay Yacht Charters. As in past years, vessel is departing to the Carib with Carib 1500 Rally. Return Ches Bay May 1995.

Vessel is pleasure only during this time. As a result we request separate Binding and coverage EFF 01 Nov, apart from the PBAY fleet.

Offshore App follows. Client would like Binder ASAP

What transpired next is a matter of dispute. According to JMA, it mailed a binder reflecting the terms of the "pleasure craft" policy to appellee on October 26, 1994. The insurance binder stated: "This binder is a temporary insurance contract subject to the conditions shown on the bottom of this page and serves as proof of insurance until you receive the actual policy." The "Navigation Limits" listed on the binder provided:

Atlantic & Gulf Coastwise & island tributary waters of the U.S. and Canada between St. John New Brunswick & Carabelle FL. both [sic] Inclusive and including the waters of Bahamas. Navigation is further extended to include the waters of the Caribbean Sea to 11 Degrees North Latitude *from 11/01/94 to 07/01,* but excluding Haiti, Cuba, and the Dominican Republic. A two (2%) deductible applies while in Bahamas and Caribbean Waters.

(Emphasis added). JMA also contends that it subsequently mailed a copy of the policy to appellee. Appellee, however, disputes that he received a copy of the policy and binder before the loss that spawned this litigation.

Regardless of when JMA sent the binder to appellee, and despite the terms of the pleasure-craft policy Wells had negotiated with CIGNA, it is clear that in the fall of 1994, JMA sent Dr. Zeitler a "renewal application", as it had done in previous years. An undated cover letter from JMA agent Teresa Kellum again instructed appellee to review his "current coverages" and sign the "renewal application." The letter said, in part:

Your policy is due to renew shortly and we would like you to take a few moments to review your current coverages.

Enclosed you will find a Renewal Application reflecting your current coverages. Please review the application carefully and verify that the information we have is complete and correct by making the changes directly on the application, signing it and returning it to our office. Up to date information allows me to select the most appropriate coverage for your yacht at the most competitive rate. The application can be returned with your check for the renewal premium in the enclosed envelope.

The "renewal application", which appellee signed on November 8, 1994, did not reflect the changes in coverage contained in the insurance binder that JMA claimed it mailed to Dr. Zeitler on October 26, 1994. The application indicated that appellee's premium for the upcoming year would be $2,668.00, which was $99.00 more than appellant had paid the previous year. The "Navigation Zone" on the renewal application for November 1, 1994 through November 1, 1995, was identical to the one for the period covered by the policy in effect for the period of November 1, 1993 through November 1, 1994. It said: "Atlantic Coast from Eastport, ME to Cedar Key, FL including the Caribbean Box; 9–19 degrees North to 58–73 degrees West and all transits in between."

Appellee made several changes to the 1994 application. He added "radar" and "SSB Radio" to the list of navigation equipment. He also indicated that he wished to insure a "Dinghy and Motor", valued at $5,000.00. On November 29, 1994, JMA wrote Dr. Zeitler a letter requesting more information about the Dinghy and an additional $125.00 premium. Appellee paid the additional premium by check dated December 29, 1994.

In the fall of 1994, Dr. Zeitler sailed to the Caribbean. During the winter of 1995, the boat experienced engine trouble. Because of previous business obligations, appellee returned to Toronto and left the boat docked at the Simpson Bay Yacht Club ("Simpson Bay") on the island of St. Maarten. As we mentioned earlier, on September 4, 1995, Hurricane

Luis wreaked havoc on the island. The *Serefe* sank while moored at the Simpson Bay dock.

When Dr. Zeitler learned that his vessel had sunk, he called JMA to make a claim under his policy. After JMA submitted a claim to CIGNA, the insurer dispatched a surveyor to the site. Upon reviewing the damage, the surveyor concluded that the damage to the vessel exceeded $234,000.00, the limits of appellee's policy.

On November 8, 1995, CIGNA notified appellee of its denial of benefits under the policy. CIGNA cited the navigation warranty contained in appellee's insurance policy, which it said was sent to appellee "by [his] agent, Morgan Wells, on October 26, 1994 in the form of the Insurance Binder." The warranty did not provide coverage for the boat while in the Caribbean at the time in question. Thereafter, appellant arranged for the *Serefe* to be raised and restored, at a cost of $200,329.74.

On April 9, 1996, appellee filed a two-count complaint against JMA and CIGNA. Count I alleged that CIGNA breached its contract with appellee when it "fail[ed] to provide him with coverage for which he applied in his Renewal Application for policy year 1994–1995 and by failing to notify [appellee] of any change to the 1994–1995 policy." Count II sought damages from JMA for negligence. Dr. Zeitler averred that he "relied upon the expertise, and advice of [JMA] to provide him with proper and adequate insurance coverage for his boat and to make sure the boat was insured for damage and/or destruction caused by natural disasters such as a hurricane, without limitation, as he had requested in his Renewal Application for the policy year 1994–1995." Appellee claimed JMA was negligent in "failing to procure the insurance coverage [appellee] requested" and "not notifying [appellee] of any change in his renewal policy that reduced the benefits that had been available to [appellee] during the previous policy period."

On January 29, 1997, appellee amended his complaint to add a negligence claim against CIGNA and a breach of contract

claim against JMA for each party's failure to procure the insurance that appellee requested in his Renewal Application. The Amended Complaint also added a reformation count against both appellants, asking the court to reform the insurance contract to include the language of the navigation policy that existed in the previous year's policy. The reformation count was premised on an assertion that the Code of Maryland Regulations ("COMAR"), at 09.30.32.02(a), imposed an obligation on CIGNA to "give its insured written notice of any change in a renewal policy which effects an elimination of or reduction in benefits from those that previously existed."

On March 27, 1997, appellee filed a Motion for Partial Summary Judgment as to liability against both defendants. On April 14, 1997, JMA filed a cross-motion for summary judgment as to Count V of the complaint (Reformation of Contract). On the same day, CIGNA filed its own cross-motion for summary judgment as to all counts lodged against it. The court conducted a hearing on the parties' motions on May 22, 1997. After oral argument, the court granted JMA's motion for summary judgment as to Count V of the complaint, but it denied the remaining motions. The court said:

> This is what I think. I am going to deny both motions for summary judgment of both defendants. And I will tell you why I am going to do it. Because it is clear to me that you can't simply send a binder without any—you should say: notice, I am changing it in some fashion. I think that was the purpose of this [COMAR] provision. In fact, they show it to you. They say the notice can be by way of the following phrase or equivalent: notice, certain coverage is being changed, something is being done. But just to simply run it on and on and on with a binder, I think that is the purpose of this regulation.
>
> So under the circumstances I am going to deny those motions for summary judgment.
>
> I doubt your client, Jack Martin, is responsible. *I don't think that this provision itself if intended for an agent. But they certainly could be liable under contract or negligence. I don't think under COMAR....*

First, Cigna filed a motion for summary judgment which I am going to deny totally. With regard to the Jack Martin Associates, I am going to deny any summary judgment with regard to contract and negligence counts, *but I will grant it as to COMAR.*[3]

(Emphasis added).

Trial was set for November 18, 1997. On October 31, 1997, CIGNA filed a motion in limine, seeking to prevent appellee from relying on COMAR in connection with his claims about the policy. CIGNA asserted, *inter alia*, that the pertinent provision of COMAR applied only to property or casualty insurance policies, not marine insurance policies. Just prior to trial, the court denied CIGNA's motion.

Dr. Zeitler testified at trial that in each of the four years he obtained insurance through JMA, he received an application from JMA to review, sign, and return with payment. He described the arrangement in the following way: "[M]y understanding was that I applied for [insurance] and Jack Martin, my insurance agent, will look for the insurance for what I applied for. And if for any reason they wouldn't get it, they would let me know and say, 'Look, we can't get that.'"

Appellee testified that, in the fall of 1994, no one from JMA told him that he was being issued a personal pleasure craft policy as opposed to a fleet policy. Further, appellant testified that he did not know of the navigational restriction on his 1994–1995 policy until his boat sank. Dr. Zeitler also said that he did not remember receiving an insurance policy from CIGNA after completing his 1994–1995 application. The following colloquy is relevant:

> [APPELLEE'S COUNSEL]: After you sent your application back to Jack Martin & Associates, do you recall receiving the actual insurance policy shortly after that?

---

**3.** In fact, JMA had not moved for summary judgment "with regard to contract and negligence counts." Its cross-motion was limited to Count V.

APPELLEE: I don't. As I have said in the depositions, I'd been traveling before that date. I came back to Toronto on the 6th of November. And shortly after the 8th, I think, on the 9th, I traveled again for another three or four weeks.

[APPELLEE'S COUNSEL]: Well, did you keep a file on this boat in your office?

APPELLEE: Yes.

[APPELLEE'S COUNSEL]: And after the boat sunk in September of 1995, did you look at the file to see if there was a copy of the policy in there?

APPELLEE: No, I was not able to do that because I was traveling at that time again.

[APPELLEE'S COUNSEL]: Well, assuming, Dr. Zeitler, that you had received a copy of your renewal policy, would it have been your practice to sit down and read that policy from cover to cover?

APPELLEE: No, I would not have read it.

[APPELLEE'S COUNSEL]: Why not?

APPELLEE: Well, because I send off my application, I was happy with what I asked to be insured for. And as long as nobody told me no, you cannot be insured for this, I was assuming that I was insured for what I applied for.

Appellee explained that he traveled "about half of the year." Mail that arrived at his house while he was away would be sorted by other people in his household and then taken to his office in Toronto, where his secretary would file it. From mid-October to mid-December of 1994, appellee was without a full-time secretary. Appellee did not know whether the application for insurance came with a policy binder; his practice was personally to review mail that asked him to respond in some way. He testified, however, that if he would have read the navigation restriction on the 1994–1995 policy, he "would have never accepted it", because it did not provide coverage for the Caribbean islands during the entire term of the policy.

The following portion of appellee's testimony on cross-examination is also relevant:

[COUNSEL FOR CIGNA]: . . . You understood at the time [appellee submitted his application] that the application represented your request to the insurance company for coverage; correct?

APPELLEE: Yes.

[COUNSEL FOR CIGNA]: The application was not the statement of your coverage from the insurance company; correct?

APPELLEE: That is correct. But I would have expected that they would tell me if they were not effective.

[COUNSEL FOR CIGNA]: Well, that wasn't my question. My question was, you understood that it wasn't a statement of your coverage. It wasn't a statement from the insurance company that we are going to provide you with "x" coverage. You understood that, correct?

\* \* \*

APPELLEE: I understood that Jack Martin suggested to me that this is the coverage which you wanted to have or you should have. And I looked through it, and I said, "Yes, that's the coverage I want," and I signed it.

[COUNSEL FOR CIGNA]: So it was the coverage that you wanted Cigna to provide to you?

APPELLEE: Yes.

[COUNSEL FOR CIGNA]: Okay

APPELLEE: And every year Jack Martin gave me that coverage.

[COUNSEL FOR CIGNA]: And if you heard nothing back from Jack Martin, you assume that Jack Martin was able to obtain the coverage that was set forth in the application.

APPELLEE: That's right.

[COUNSEL FOR CIGNA]: But you didn't independently verify or determine whether or not that in fact was the case; isn't that correct? In other words, you didn't read the policy, you didn't read the binder. You didn't read any

other policy document to see if in fact you got that coverage; isn't that correct?

APPELLEE: That is correct.

\* \* \*

[COUNSEL FOR CIGNA]: If you didn't hear anything from Jack Martin, you thought everything was okay.

APPELLEE: Yes. If they told me, "Look, sorry, we couldn't get that coverage for you," I would have talked to them. I would have said, "Well, how do we do it."

In addition, CIGNA's counsel introduced as evidence a transcript of a telephone interview of appellee, conducted by Walter Novak, a Cigna Marine Claims Specialist, on September 27, 1995, approximately three weeks after the hurricane. During this conversation, appellant admitted that he had received the 1994–1995 insurance policy. The following portion of the transcript is relevant:

Q. Alright then. Did did you did [sic] get a copy of the Yacht policy though when it was renewed you know under your name solely uh November 1, 1994 is what I am referring to?

A. That's right, that's right.

Q. You did receive that policy?

A. I did receive the policy yes.

Q. Did you review it or go over it with your agent or Noreen or anybody or read it?

A. No I did not and and and I guess you know that certainly um a fault of mine that I didn't do that but since since the um uh the uh the premium was was basically the same as I guess it was a little bit higher than the year before. Um you know I I I just I just didn't think that that there's any change in the policy um from the year before.

When confronted with his earlier statement, Dr. Zeitler testified that he based his answers to Novak's question on the documents he found in his file at the time. The following portion of Dr. Zeitler's trial testimony is pertinent:

[COUNSEL FOR CIGNA]: Now, do you remember Mr. Novak asking you whether you got a copy of the policy.

APPELLEE: Yes.

[COUNSEL FOR CIGNA]: And do you remember what you told him in response?

APPELLEE: I told him how I had received the policy. I told him that my secretary sent it to me while I was traveling. At the time I was not aware where that document came from, whether this document came from my file or whether it came from the insurance company or whether it came from the agent. I only found out subsequently that that insurance policy was the one which Jack Martin sent me on September 11, which was after the accident. And that was the insurance policy which I read.

Both defendants moved for judgment at the close of appellee's case. As to the negligence count, JMA argued that appellee failed to present expert testimony establishing "what the yardstick is" for a professional insurance agent. With regard to the breach of contract claim, JMA contended that appellee failed to establish that JMA ever promised appellee that it would procure an insurance policy identical to the one appellee had the year before. Relying on *Twelve Knotts Limited Partnership v. Fireman's Fund Insurance Co.*, 87 Md.App. 88, 589 A.2d 105 (1991), JMA also argued that appellee was contributorily negligent by failing to read the insurance policy. For its part, CIGNA reiterated its argument regarding the applicability of COMAR, and contended that Dr. Zeitler's reliance on the Renewal Application to define the actual terms of his insurance policy was misplaced. The court seemed poised to grant appellants' motions for judgment. Addressing counsel for appellee, the court said:

Well, I will hear anything you have to say, because I think I am going to have to grant the motions. I think it is absolutely clear in this case. I think it is absolutely clear. I don't know how I could do otherwise.

Counsel for appellee convinced the court, however, that a disputed issue of fact precluded judgment; namely, whether

appellee actually received a copy of the insurance policy prior to the hurricane. Dr. Zeitler's counsel argued that appellee's tape recorded statement was unclear about when he received a copy of the policy. Further, he asserted that a jury could infer, based on the statement, that appellee received a copy of the policy *after* the damage to the vessel had already occurred. Persuaded by appellee's arguments, the court reserved ruling on the motions for judgment.

Morgan Wells also testified at trial for JMA. He stated that, in October 1994, after the Annapolis Boat Show, he met with representatives of Paradise Bay to review the insurance status of the boats in the Paradise Bay fleet. During the meeting, he was informed that Dr. Zeitler's boat would no longer be part of the fleet, because it would be participating in a cruise rally called the "Caribbean 1500." The *Serefe* 's current insurance policy was set to expire on November 1, 1994. Accordingly, on or about October 21, 1994, Wells submitted an application to CIGNA to insure the boat. Wells said:

> I knew I had to act very quickly, and I didn't want the—I did not want this vessel to be uninsured, any vessel to be uninsured. I do work as a commission-producing agent. We did—so I felt it was very, very important to get this information together and to get it to this underwriter at Cigna so that they could provide a quote to insure this vessel.

Wells testified that he instructed Teresa Kellum, a member of the JMA office staff, to prepare and mail a binder, application, and invoice regarding the *Sefere*'s 1994–1995 coverage.

The videotaped deposition of Teresa Kellum was also presented to the jury as part of JMA's case. Through Kellum, JMA introduced as evidence a "Contact Record" that chronicled JMA's activity regarding the *Serefe*. Kellum stated that she made a handwritten entry on that document, dated "10 28 94", which said: "Sent insure[d] app invoice renewal letter Binder". Based on her notation, Kellum surmised that she sent an application, renewal, invoice, and a binder to Dr. Zeitler on October 28, 1994. On cross-examination, however,

Kellum admitted that she did not independently remember sending the binder to Dr. Zeitler. Moreover, her records did not indicate that she sent the CIGNA policy to him.

Patricia Curley, a yacht underwriter for CIGNA, also testified at trial. According to Curley, a commercial fleet policy is evaluated under different underwriting guidelines than a private pleasure-craft policy. The following portion of Curley's testimony is pertinent:

[COUNSEL FOR CIGNA]: Now before [the 1994–1995] policy came into existence, what type of policies were issued to Dr. Zeitler?

CURLEY: The policy that was issued prior to this policy was a fleet policy, which was considered commercial because it allowed the fleet people covered by that policy to charter out their vessel.

\* \* \*

[COUNSEL FOR CIGNA]: And was this [1994–1995] windjammer policy the first one issued by Cigna to Dr. Zeitler?

CURLEY: Yes.

[COUNSEL FOR CIGNA]: All the prior policies were a fleet policy?

CURLEY: Were fleet policies.

\* \* \*

[COUNSEL FOR CIGNA]: How did the policies differ, if at all, between the two types of policies?

CURLEY: Well, Paradise Bay was considered a commercial policy. So —— and it had probably —— I don't know how many insureds on it, but it was more than one insured under the name Paradise Bay. And this is just for an individual, an individual who's just using it for his own use. So it's considered a private pleasure policy.

[COUNSEL FOR CIGNA]: Were the two types of policies evaluated differently??

CURLEY: They were evaluated differently.

[COUNSEL FOR CIGNA]: How so?

CURLEY: Well, they're considered two different exposures.

[COUNSEL FOR CIGNA]: Are there separate underwriting guidelines for each type of policy?

CURLEY: Yes.

[COUNSEL FOR CIGNA]: Was this windjammer casualty policy issued for the '94/'95 policy period considered a renewal from Cigna's perspective?

CURLEY: No. It was considered a new piece of business.

At the close of evidence, appellants renewed their motions for judgment. The court again reserved ruling. On November 20, 1997, the jury found in favor of appellee on all counts, and awarded him $200,329.74 in damages.

We will include additional facts in our discussion of the issues.

### Discussion

### Standard of Review

Appellants contend that they were entitled to judgment as a matter of law. Our review of the trial court's denial of appellants' motions for judgment, and their motion for judgment notwithstanding the verdict, is quite narrow. Md. Rule 2–519(b), which governs the grant of a motion for judgment, provides:

> (b) *Disposition.* When a defendant moves for judgment at the close of the evidence offered by the plaintiff in an action tried by the court, the court may proceed, as the trier of fact, to determine the facts and to render judgment against the plaintiff or may decline to render judgment until the close of all the evidence. When a motion for judgment is made under any other circumstances, *the court shall consider all evidence and inferences in the light most favorable to the party against whom the motion is made.*

(Emphasis added). Thus, "the court's determination should be upheld ' "[i]f there is any evidence, no matter how slight,

legally sufficient to generate a jury question." ' " *N.B.S., Inc. v. Harvey,* 121 Md.App. 334, 341, 709 A.2d 162 (1998) (citations omitted); *see Nationwide Mut. Fire Ins. Co. v. Tufts,* 118 Md.App. 180, 189, 702 A.2d 422 (1997), *cert. denied,* 349 Md. 104, 707 A.2d 89 (1998).

## I. Expert Testimony

■ JMA asserts that it was entitled to judgment as to the negligence claim, because Dr. Zeitler failed to offer expert testimony regarding the duty of care JMA owed to its client as a professional insurance broker. Essentially, we must determine whether the evidence presented by appellee regarding JMA's duty toward Dr. Zeitler was " 'beyond the ken of the average layman.' " *Hartford Acc. and Indem. Co. v. Scarlett Harbor Assocs. Ltd. Partnership,* 109 Md.App. 217, 257, 674 A.2d 106 (1996), *aff'd,* 346 Md. 122, 695 A.2d 153 (1997) (quoting *Virgil v. "Kash N' Karry" Service Corp.,* 61 Md.App. 23, 31, 484 A.2d 652 (1984), *cert. denied,* 302 Md. 681, 490 A.2d 719 (1985)). In our view, it was not. We explain.

Maryland Rule 5–702 provides that "[e]xpert testimony may be admitted, in the form of an opinion or otherwise, if the court determines that the testimony will assist the trier of fact to understand the evidence or to determine a fact in issue." In some circumstances, expert testimony is required in order to prevail. *See* Joseph F. Murphy, Jr., *Maryland Evidence Handbook,* § 1401 at 703 (2d ed.1993) (stating that "When substantive law requires expert testimony to generate an essential element of a claim or defense, the party who bears the burden of production on that issue will lose on a motion for judgment unless testimony is presented on the critical issue"). Expert testimony is generally required " 'when the subject of the inference [presented to the jury] is so particularly related to some science or profession that it is beyond the ken of the average layman.' Expert testimony is not required, however, on matters of which the jurors would be aware by virtue of common knowledge." *Scarlett Harbor Assocs., supra,* 109 Md.App. at 257, 674 A.2d 106 (citation omitted).

Often, allegations of professional malpractice require expert testimony, because the intricacies of professional disciplines generally are beyond the "ken of the average layman." What the Court said in *Crockett v. Crothers,* 264 Md. 222, 224–25, 285 A.2d 612 (1972), is pertinent here:

In an action against a professional [person] for malpractice, the plaintiff bears the burden of overcoming the presumption that due skill and care were used. Although there may be instances in which the negligence is so gross or that which was done so obviously improper or unskillful as to obviate the need for probative testimony as to the applicable standard of care, (and here we proceed on the assumption that this is not such a case), generally there must be produced expert testimony from which the trier of fact can determine the standard of skill and care ordinarily exercised by a professional [person] of the kind involved in the geographical area involved and that the defendant failed to gratify these standards.

(Citations omitted).

Nevertheless, the *Crockett* case illustrates that expert testimony is not always required, even when the professional act at issue is relatively complex. *Crockett* involved an allegation of negligence by an engineer who produced plans for the City of North East as part of a private contract with the city. By all accounts, the engineer's plans failed to indicate that a water main in a residential neighborhood was broken. Unaware of the danger, a construction crew inadvertently caused the water main to flood the home of a local couple, who sued the contractor and the engineer. 264 Md. at 223, 285 A.2d 612. Without the benefit of expert testimony, the jury concluded that the engineer's failure to " 'exhaust all [reasonable] possibilities' of discovering that the water main was where it was" violated the "normal and customary standard of care" required of him as a professional engineer. *Id.* at 226, 285 A.2d 612 (quoting Mr. Crockett).

On appeal, the engineer claimed that expert testimony was required in order to define the standard of care. The Court

disagreed, concluding that the jury did not need an expert in order to determine if the engineer was negligent. The Court noted, in particular, that the engineer could have asked city officials whether they had a map showing subsurface pipes in the area. *Id.* at 226, 285 A.2d 612. Moreover, the evidence established that the engineer knew about a previous set of plans drawn by another engineering company that showed the broken main. *Id.* In the face of this evidence, expert testimony was not required.

We are aware of one reported Maryland opinion addressing the question of whether expert testimony is necessary to support an allegation of negligence against a private insurance broker. In *Lowitt and Harry Cohen Ins. Agency, Inc. v. Pearsall Chemical Corp. of Md.*, 242 Md. 245, 219 A.2d 67 (1966), an insurance broker advised its client, the Pearsall Chemical Corporation, that its "public liability" policy was about to expire. *Id.* at 248, 219 A.2d 67. At the recommendation of the broker, the company agreed to purchase insurance from a foreign company. Thereafter, the broker provided Pearsall with a binder indicating that the company was insured by "Underwriters at London." *Id.* Based on the broker's representations, the company believed it was insured by Lloyd's of London. In truth, "Underwriters at London" did not exist, and the broker had failed to procure a liability policy for its client.

On appeal, the broker argued that "the degree of skill and diligence required of [him] could only be established by expert testimony as to the degree of skill and diligence usually employed by brokers" in similar circumstances. *Id.* at 254, 219 A.2d 67. The Court of Appeals rejected the broker's argument, adopting as a standard of care the statement of Professor Couch relating to insurance brokers:

'An agent, employed to effect insurance, must exercise such reasonable skill and ordinary diligence as may fairly be expected from a person in his profession or situation, in doing what is necessary to effect a policy, in seeing that it effectually covers the property to be insured, in selecting the insurer and so on.'

* * *

'As a general rule, a broker or agent who, with a view to compensation for his services undertakes to procure insurance on the property of another, but fails to do so with reasonable diligence, and in the exercise of due care, or procures a void or defective policy * * * is personally liable to his principal for any damages resulting therefrom. In fact, a broker taking money to secure insurance, who unjustifiably fails to secure the same, or to make an effort to do so, becomes liable, in case of loss, to pay as much of the same as would have been covered by the policy had it been secured.'

*Lowitt,* 242 Md. at 254, 219 A.2d 67 (quoting Couch, *Insurance* 2d, § 25:37).

The Court noted that the broker "undertook ... for consideration ... to obtain for [the company] an effective public liability policy" and then "failed to produce any policy whatsoever." *Id.* at 255, 219 A.2d 67. Under such circumstances, the Court determined that an expert was not needed to establish the broker's breach of duty; none of the broker's misdeeds were as complicated as they were egregious. Furthermore, the Court recognized that "it does not require an expert in the insurance field to see, even by a most casual examination, that Lloyd's of London was not a party" to the insurance binder. *Id.* "[A]ny insurance broker, by the exercise of the most meager care, could and should have ascertained" that "Underwriters at London, England" did not exist. *Id.* at 256, 219 A.2d 67.

Cases from other jurisdictions demonstrate that "[n]o clear standard has evolved for determining whether a particular negligent act sufficiently involves an agent's professional skills so as to require the use of expert testimony." Lori J. Henkel, *Necessity of Expert Testimony to Show Standard of Care in Negligence Action Against Insurance Agent or Broker,* 52 A.L.R. 4 th 1232, 1234 (1987 & 1998 Supp.). Nevertheless, the cases generally hold that when a broker fails to procure insurance that is specifically requested, an expert is not

needed in order to prove negligence. *Id.; see, e.g., Johnson & Higgins of Alaska, Inc. v. Blomfield,* 907 P.2d 1371 (Alaska 1995)(holding that expert testimony was not required when an insured's broker failed to acquire insurance that covered mold in the ventilation system of a commercial office building, despite the insured's request); *BSF, Inc. v. Cason,* 175 Ga. App. 271, 333 S.E.2d 154 (1985)(holding that an expert is not required when insurance broker allegedly failed to record accurately the insured's answers to questions on the application, resulting in denial of coverage for the insured).

JMA contends that this case involved a complex issue about "whether Jack Martin had a duty to procure additional coverage for Dr. Zeitler's boat during hurricane season." JMA ignores the fundamental nature of Dr. Zeitler's negligence claim. Dr. Zeitler merely alleged that JMA negligently failed to acquire the insurance as requested on the application form, and as previously provided. Instead, JMA procured a policy different from the one the year before, and different from the one described in the "renewal application", and then failed to inform appellee that the new policy had different terms than the previous year's policy. Appellee did not allege, either in his complaint or at trial, that JMA should have procured "additional coverage." Therefore, an evaluation of appellee's negligence claim did not require acute insight into the vagaries of marine insurance. Moreover, appellee's theory was not contingent on the regulatory notice provision of COMAR § 09.30.32.02(a), nor was it contingent on a showing that JMA had an affirmative obligation to obtain insurance without being asked to do so.

JMA relies principally on two foreign cases, each of which is distinguishable on its facts. In *Atwater Creamery Co. v. Western Nat. Mut. Ins. Co.,* 366 N.W.2d 271 (Minn.1985), a long-time insurance broker for Atwater Creamery procured for his client an insurance policy that included coverage for burglary, but excluded coverage if no sign of forcible entry was present. Some time later, burglars stole $15,587.40 worth of chemicals from one of the Creamery buildings. The burglars left no sign of forced entry, however; they gained access

to the building through a side door that had been left ajar. Consequently, the insurance company denied the company's claim. The Creamery then sued the broker, alleging that the broker had a duty to inform him of the "gap in coverage" created by the exclusionary clause. But the Creamery failed to introduce expert testimony as to a broker's duty to evaluate that gap in the context of a commercial insurance policy. The Supreme Court of Minnesota held that "[t]he standard of care issue in this case goes beyond what the agent should do when clearly requested; it goes to the broader issue of affirmative duties where no request has been made." *Id.* at 279. Therefore, it affirmed the trial court's decision to grant a directed verdict in favor of the broker. Unlike *Atwater,* however, JMA's negligence does not turn on whether it correctly evaluated the insurance ramifications of Dr. Zeitler's Caribbean travel plans. Moreover, whether a broker must anticipate the possibility of a burglary with no signs of forcible entry is a complex question that involves discerning how many of the virtually infinite number of potential risks a broker must anticipate.

*Humiston Grain Co. v. Rowley Interstate Transp. Co., Inc.,* 512 N.W.2d 573 (Iowa 1994), is similarly inapposite. There, Humiston Grain Co. ("Humiston") leased a trailer from Rowley Interstate Transportation Co. ("Rowley"). Humiston pulled the leased trailer with its own semitractor, which was driven by a Humiston employee. Unfortunately, the truck and the trailer were involved in a collision with a train, which spawned a dispute as to who was liable for damage to the leased trailer. In the wake of the accident Humiston sued its insurance broker, alleging negligence, based on the broker's assurances before the accident that Rowley, and not Humiston, was required, under the terms of the lease, to carry collision insurance on the trailer. After judgment was entered in favor of Humiston, the broker appealed, complaining that Humiston failed to introduce expert testimony as to the standard of care required of a broker. The Iowa Supreme Court held that "where an insurance agent is alleged to have breached a professional duty, if the error or omission extends beyond

the agent's mere failure to procure coverage requested and paid for by the client, proof of the standard of care applicable to the circumstances must be established by expert testimony." *Id.* at 576.

The above cases suggest that the duty to render a professional judgment regarding a subrogation clause in a commercial lease is beyond the ken of the average juror. In contrast, the issue concerning the duty to inform a client that the coverage actually obtained differs from what was sought is, ordinarily, not beyond the understanding of the average juror. To be sure, JMA's negligence was not as egregious as that of the broker in *Lowitt*. Nevertheless, while it may differ in degree, the gist of the contention in *Lowitt* is the same as the complaint lodged by Dr. Zeitler——a failure to procure the insurance coverage requested and promised. Accordingly, we perceive no error in the trial court's denial of appellant's motion for judgment on this ground.

## II.  COMAR

Appellee's negligence and breach of contract claims against CIGNA were grounded on an allegation that CIGNA failed to comply with COMAR 09.30.32, because it did not notify appellee that his "renewal" policy for 1994–1995 contained a reduction or change in benefits. At trial, CIGNA adamantly opposed the view that COMAR governed the policy. In our view, CIGNA's assertion that the notice provisions of COMAR did not apply to the *Serefe* policy is without merit.

Title Nine of COMAR contains regulations promulgated by the Insurance Division of the Department of Licensing and Regulation. At the time of the loss, COMAR 09.30.32 provided, in pertinent part: [4]

**Chapter 32    Addition, Reduction, or Elimination in Coverage Notice Requirement**

**.01  Purpose.**

---

**4.** Effective July 1998, the provisions of COMAR 09.30.32 were recodified, without substantive change, at COMAR 31.08.05.

Often when a property and casualty policy is renewed, coverage is reduced or eliminated or deductibles are increased. There may also be automatic increases in policy limits pursuant to construction or inflation indices. The purpose of these regulations is to require all property and casualty insurers who intend to reduce or eliminate coverage, change a deductible or increase policy limits to clearly notify the policyholder of the action that has been taken.

**.02  Notice Requirement.**

A.  After July 30, 1981, if any insurer upon renewal or by endorsement initiates any change in any primary property or casualty policy, which is not at the request of the insured (except for motor vehicle liability insurance to which Article 48A, § 240AA is applicable), which effects an elimination of or reduction in benefits including any increase in deductible, the insurer shall give the insured, in general terms, written notice of the change in the policy. The notice may be mailed or delivered to the insured by the insurer or its authorized representative, in which case the insurer shall provide its authorized representative with the appropriate notice. This notice can be by way of the following phrase or its equivalent:

Notice: Certain coverage in this policy has been eliminated or reduced, or a change has been made in the deductible. The description of the change in coverage is as follows:

* * *

**.03  Penalties.**

If any insurer issues a policy in this State in which a change in coverage or deductible pursuant to Regulation .02A occurs and no notice as required above is given to the policyholder, then the policy with adjustment in premium shall be treated as being in effect without the change or reduction in coverage or deductible when a claim occurs which is affected by the change.

As we noted, On May 22, 1997, the court granted partial summary judgment in favor of JMA as to Count III (reformation of contract), concluding that COMAR 09.30.32.02 did not apply to insurance brokers. The court found, however, that CIGNA, as Zeitler's insurer, was bound by the regulation. Subsequently, the court denied CIGNA's motion in limine, which sought to preclude appellee's COMAR arguments at trial. The court included the substance of the COMAR regulation in its instructions to the jury, stating:

Now this instruction that I am giving to you now only applies to the case regarding Cigna.[5]  A law or ordinance in effect at the time a contract was made becomes a part of the contract just as if the parties expressly included the provisions of the law or ordinance in the contract.

Negligence is doing something that a person using ordinary care would not do or not doing something that a person using ordinary care would do.  Ordinary care means that caution, attention or skill a reasonable person would use under similar circumstances.

The next instruction I give you again only applies to Cigna.  Violation of a statute, which is a cause of plaintiff's injuries or damages, is evidence of negligence.

\* \* \*

*You must decide whether the Cigna policy which was in effect from November 1, 1994, to November 1, 1995, was, A, a renewal or, B, a new insurance contract.  A renewal is an extension of a prior policy's life and is not a new contract.*

*If you conclude that this policy was a renewal, then you must consider the following requirement.  If you find that it was a new contract, then the following requirement does not apply.  If an insurance company initiates any change in a primary property or casualty renewal policy which is not at the request of the insured and which affects an*

---

**5.**  CIGNA is spelled "Cigna" in the transcript.

*elimination of or reduction in benefits, the insurance com-*
*pany must give the insured in general terms written notice*
*of the change in the policy.* This notice may be mailed or
delivered to the insured by the insurance company or one of
its authorized agents or representatives.

There is no requirement that any specific language be
used when providing this notice. Further, there is no
requirement that the word "reduction" be used in this
notice, nor does the insurance company have to fully explain
how a policy will affect the insured's prior coverage.

(Emphasis added).

CIGNA contends that COMAR 09.30.32.02 could not form
the basis of its contract or tort liability for several reasons.
First, the insurer maintains that COMAR does not apply to
"marine" insurance policies. In its view, "marine" insurance is
distinct from "property" and "casualty" insurance, and not
within the purview of the regulation. Second, CIGNA asserts
that even if COMAR 09.30.32.02 contemplates marine insur-
ance generally, it did not apply to CIGNA's policy with Dr.
Zeitler, because COMAR governs only policies issued in this
State. CIGNA contends that here, the claim involved a
contract between a New York Company (CIGNA) and a
Canadian citizen (Dr. Zeitler) for a loss that occurred in the
Netherlands Antilles. Third, CIGNA argues that the policy at
issue was not a renewal policy, because appellee was no longer
part of the fleet insurance. Rather, CIGNA issued a new,
private pleasure-craft policy that insured against an entirely
different set of risks than the policies issued in previous years.
Fourth, CIGNA argues that even if it had a statutory duty to
inform Dr. Zeitler of the change in coverage, the insurance
binder mailed to appellant was sufficient to satisfy the regula-
tion's requirements.

■ Appellee counters that CIGNA waived its right to
challenge the COMAR aspects of the court's jury instructions,
because it failed to note an exception. Although CIGNA
moved for judgment notwithstanding the verdict, appellee
contends that the court's denial of that motion is not pre-

served, because CIGNA did not assert an argument based on COMAR in its motion for judgment at the close of evidence. Appellee also contends that COMAR governs the policy.

Preliminarily, we are satisfied that CIGNA preserved the issue for our review. From the outset of the case, CIGNA diligently contested appellee's application of COMAR to the *Serefe* policy. Indeed, the arguments CIGNA now marshals on appeal were first presented to the trial court in CIGNA's motion for summary judgment. Then, just prior to trial, CIGNA pressed the arguments again in its motion in limine, in which CIGNA asked the court for a "pre-trial ruling on the applicability of COMAR 09.30.32.02 to the facts of this litigation". On the morning of trial, the court heard oral argument on that motion. Thereafter, at the close of its case, CIGNA moved for judgment, stating, in part:

> I would just like to reiterate what we —— set forth in my motion in limine regarding the inallocability [sic] of the notice provision set forth in COMAR. Obviously we've gone over it, so I am not going to go over it again.

At the close of all the evidence, CIGNA said: "Your Honor, I renew my motion. I am not going to rehash what we said earlier today." Then, after trial, CIGNA again presented its COMAR arguments in a motion for judgment notwithstanding the verdict.

CIGNA's repeated assertions gave the court ample opportunity to decide the question now raised on appeal. Accordingly, we turn to consider the merits of CIGNA's contention.[6]

■ COMAR 09.30.32.02A applies only when an insurer reduces benefits "upon renewal or by endorsement" of a policy. Thus, the threshold question is whether Dr. Zeitler's 1994–1995 policy was a "renewal," or whether it constituted a

---

**6.** Recently, in *Reed v. State*, 353 Md. 628, 728 A.2d 195 (1999), the Court of Appeals reaffirmed that when a pretrial motion in limine is denied, the contemporaneous objection rule set forth in Md. Rule 4–323(a) applies. Therefore, a party must object when evidence is offered, even if the evidence was the subject of the motion in limine. 353 Md. at 638, 728 A.2d 195.

"new" policy. Neither party presented expert testimony at trial concerning the nature of a "renewal" policy. And, as we noted, the court instructed the jury to resolve the issue. We are of the view that, for the purposes of COMAR 09.30.32.02A, Dr. Zeitler's 1994–1995 pleasure-craft policy was a "renewal" of the insurance he had previously placed with CIGNA. We explain.

Maryland cases are clear that an insurance policy may be considered a "renewed" policy even though it contains new terms. *See World Ins. Co. v. Perry*, 210 Md. 449, 454–55, 124 A.2d 259 (1956)(stating that "parties may renew [an insurance] policy on terms different from those contained in the original contract . . . ."); *see also American Casualty Co. of Reading, Pa. v. Resolution Trust Corp.*, 845 F.Supp. 318, 323 (1993)(observing that "Maryland recognizes that an insurance policy may be deemed a renewal even if the terms of a predecessor policy are changed"); *accord, Benner v. Nationwide Mut. Ins. Co.*, 93 F.3d 1228, 1236 (1996).

The case of *J.A.M. Assocs. of Baltimore v. Western World Ins. Co., Inc.*, 95 Md.App. 695, 622 A.2d 818 (1993), is instructive. There, a group of partnerships and joint ventures that owned residential investment properties in Baltimore City insured the properties through a policy written by the Western World Insurance Company ("Western World"). The policy was acquired through the efforts of a broker hired by the insureds. In a policy in effect from 1983 through 1984, the properties were insured for a value up to $300,000 per occurrence, with a $500 deductible for all claims not related to lead paint. Lead paint claims were covered under the policy, but subject to a $5,000 deductible. *Id.* at 697, 622 A.2d 818. The following year, the insureds' broker procured a "renewal" policy that, among other things, excluded coverage for lead paint claims. According to the insureds, they did not become aware of the lead paint exclusion until 1988, when several lead paint claims were lodged against them. When the insurance company denied coverage, citing the lead paint exclusion, the insureds sued Western World. They relied on the common law principle that " ' "where an insurer agrees to renew a

policy, the insured should have a right to expect that the new protection will be in substance the same as that afforded by the former contract and upon the same conditions." ' " *Id.* at 702, 622 A.2d 818 (quoting *Government Employees Ins. v. Ropka,* 74 Md.App. 249, 267, 536 A.2d 1214, *cert. denied,* 312 Md. 601, 541 A.2d 964 (1988)(in turn quoting *Couch on Insurance* 2d § 68.61)).[7] Ultimately, we concluded that Western World provided adequate notice of the change to the insureds, because it informed the broker of the new terms prior to the renewal, and because, in the court's judgment, the insureds had adequate opportunity to discover the lead-paint exclusion.

Significantly, we did not question whether the changed policy was a "renewal". Rather, we acknowledged that what is often termed a "renewal" is, in effect, a new contract. We stated:

> To a large extent, the requirement of notice proceeds from an ambiguity in the word "renewal," which the public may, with some good reason, regard as synonymous with "extension"—a continuation of the existing policy for another term. Thus, as a matter of fairness and of assuring mutual assent to what is, in reality, a new contract, the law requires that reasonable notice be given to the insured if the insurer intends to make a significant change in the new policy.

*Id.* at 704, 622 A.2d 818.

Based on the foregoing, we are satisfied that the fact that the *Serefe* policy in 1994–1995 differed from the previous year is not dispositive as to whether it was a "renewal" policy. We are mindful that, in interpreting a statute or a regulation, "[t]he search for legislative intent begins, and ordinarily ends, with the words of the statute under review." *Schuman, Kane, Felts & Everngam, Chartered v. Aluisi,* 341 Md. 115, 119, 668 A.2d 929 (1995); *accord Martin v. Beverage Capital Corp.,* 353

---

7. We note that although COMAR 09.30.32 was in effect at the time, the plaintiff-entities could not rely on its notice requirement. COMAR 09.30.32.02(C) provides that "[t]his regulation is not applicable to commercial risks who use the services of a risk manager, broker or insurance advisor."

Md. 388, 726 A.2d 728 (1999); *Marriott Employees Federal Credit Union v. Motor Vehicle Admin.*, 346 Md. 437, 445, 697 A.2d 455 (1997). The language and context of the regulation convince us that COMAR 09.30.32 contemplates that a "renewed" policy may contain changes in the terms of the policy. Indeed, the *raison d'etre* of the provision, articulated at COMAR 09.30.32.01, is the observation that "[o]ften when a property and casualty policy is renewed, coverage is reduced or eliminated or deductibles are increased." If the existence of different terms transformed a "renewed" policy into a "new" one, the regulation would be nonsensical, because it would apply only to policies that by definition had not changed in any respect from the year before.

Certainly, there may be a circumstance in which an insurance company writes a policy on behalf of one of its insureds that departs so radically from the one written in the previous year that it can only be fairly called a "new" policy. Moreover, the risk associated with a fleet insurance contract may have been different than those associated with a policy limited to "pleasure" use. But, it is unclear to us how Dr. Zeitler could have appreciated that fact unless CIGNA or his broker informed him that the policy with the same insurer for the same boat was "new."

To be sure, the change could not have been monumental from an underwriting point of view, because Dr. Zeitler's premium increased only slightly for the "new" term. From the testimony presented at trial, it is unclear whether the slight increase in price was attributable to the new risk associated with a pleasure-craft policy; the jury may have concluded that it reflected a modest rise in costs generally.

Moreover, it is readily apparent that, from Dr. Zeitler's perspective, his 1994–1995 insurance coverage was a renewal of the policy he had with CIGNA in 1993–1994. The cover letter he received from JMA told appellee that his policy was "due to renew shortly" and referred to an enclosed "renewal application." The cover letter invited Dr. Zeitler to enclose a "check for the renewal premium in the enclosed envelope."

The application contained the following statement, which was signed by Dr. Zeitler:

> I have read the above application and declare that to the best of my knowledge and belief all of the foregoing statements are true and that these statements *are offered as an inducement to renew the policy for which I am applying.*

(Emphasis added). The details enclosed in the application also supported the conclusion that appellee was renewing his coverage. The premium was only slightly higher and, except for changes initiated by Dr. Zeitler, the property to be insured, the deductible, and the coverage ceilings remained the same.

■ We also reject CIGNA's contention that COMAR 09.30.32.02 has no application to "marine" insurance contracts. The thrust of CIGNA's argument is that the Maryland Code has established an "insurance framework" that recognizes five separate and distinct categories of insurance: "life", "health", "property", "casualty", and "marine". *See* definitions contained in Maryland Code (1995, 1997 Repl.Vol.), Insurance Article § 1–101(w),(q),(ee),(k), and (y), respectively. In CIGNA's view, these categories are mutually exclusive, so that when COMAR 09.30.32.02A only refers to "property" and "casualty" insurance, it means to exclude all others. Without using the phrase, appellant urges us to apply the canon *expressio unius est exclusio alterius,* precluding the application of COMAR 09.30.32.02A to any insurance that could be described as "marine".

In its reply brief, CIGNA further argues that the omission of the word "marine" from the COMAR provision in issue is "highly significant" and "simply cannot be ignored." In CIGNA's view, "the issue is not whether a specific exclusion was ever intended for marine policies. Rather, the issue is whether the regulation was drafted to **include** such policies of insurance." Yet, the regulation specifies a specific type of insurance that is excluded from its ambit. At COMAR 09.30.32.02, the regulation excludes "motor vehicle liability insurance to which Article 48A, § 240AA is applicable." If the

Department of Licensing and Regulation also intended the provision not to apply to marine insurance, it could easily have said so.

CIGNA relies on *Insurance Co. of North America v. Aufenkamp*, 291 Md. 495, 435 A.2d 774 (1981), in support of the proposition that the categories of insurance found in the Code are mutually exclusive. In that case, the issue was whether the husband of a woman who fell to her death from a second story window in an apparent suicide[8] was entitled to collect under a casualty insurance policy that specifically excluded coverage for self-inflicted injuries. The husband claimed that the exclusion was rendered unenforceable as a matter of law by a provision in the Maryland Code that prohibited *life* insurance policies from restricting benefits based on suicides that occurred two years after the date of the issue of the policy. *Id.* at 498–99, 435 A.2d 774. The Court of Appeals determined that terms in the decedent's *casualty* insurance contract relating to cause of death were not governed by provisions of the Code relating to *life* insurance. Appellant relies on the following portion of the Court's opinion:

> [T]he very structure of the insurance code leads us to conclude that the various types of insurance defined there ... constitute separate categories of insurance which for the most part are mutually exclusive. This is not to say that there is not, and that the legislature did not recognize, the overlap that inherently exists between the coverage under some of these varying types of insurance. This litigation, in fact, springs from an overlap between two types of insurance——life and health——which in some respects presents perhaps the best example of seemingly coinciding coverage. *See* 1 *Appleman, Insurance Law and Practice,* § 16, p. 44 (1965). But we think both the structure of the insurance article in general as well as particular sections therein indicate that the General Assembly was cognizant of this ambiguity, and attempted to specifically define as either one

---

8. The case was remanded to consider whether, in fact, the woman committed suicide.

or the other the risks normally undertaken and the benefits commonly incident to each type of insurance. In arriving at this conclusion, there is no intimation that a single policy of insurance cannot contain coverage falling into more than one statutory category. We recognize that commonly one insurance contract will insure against various risks and provide benefits for sundry kinds of harm, and the code, except for specific and well-delineated exceptions, does not affect this practice. *What we determine is that under an insurance policy covering various risks, each risk assumed will normally constitute a kind of insurance encompassed by only one statutory definition, and governed by the regulations applicable to that category alone.*

*Id.* at 506–507, 435 A.2d 774 (Emphasis added).

*Aufenkamp* sheds little light on whether COMAR 09.30.32.02 applies to marine insurance. *Aufenkamp* concerned the narrow question of whether a provision of the Code limiting exclusions in a life insurance policy also limited a similar provision in a casualty insurance policy. Despite the broad language in the passage quoted above, the Court's holding in *Aufenkamp* did not turn on declarations about the exclusivity of categories of insurance in general. Rather, the Court investigated, in thorough detail, the substantive distinction between health and life insurance *as it related to the portion of the Code at issue.* Much of the Court's analysis involved the legislative history of the provisions that defined life and health insurance, then found at Md.Code (1957, 1979 Repl.Vol.), Art. 48A, §§ 63 through 74. That analysis led the Court to conclude that "what might otherwise be perceived to be life insurance is specifically delineated to be health insurance by section 66." *Id.* at 508, 435 A.2d 774. Nevertheless, the Court warned against a formalistic approach, stating that

the issue here raised cannot be resolved by a simple examination of the terse and somewhat tautological statutory definition of life insurance, and a comparison of that definition with the fact that benefits under this policy are payable, in part, upon the death of a human being. Rather, the answer in our view is derived from an examination of the

risks normally assumed by an insurer under a life insurance or health policy, and a juxtaposition of those risks with those assumed by [the insurer] under this policy.

*Id.* at 509, 435 A.2d 774.

CIGNA has furnished no compelling reason why insureds who hold "marine" policies are entitled to any less notice than insureds who hold other sorts of insurance contracts. Nor has it shown from the legislative history what aspects of marine insurance make such a notice impracticable or outside the scope of "property insurance" as the term is used in the regulation. To exclude marine policies from the scope of COMAR's notice provision simply because marine insurance is separately defined in the Insurance Article would exalt form over substance and indulge in the simplistic analysis warned against in *Aufenkamp.*

■ We also reject CIGNA's assertion that Maryland's insurance regulations do not reach the policy at issue here because it was issued to a Canadian citizen and the loss occurred in the Caribbean. Maryland follows the rule of *lex loci contractus,* "which requires that the construction and validity of a contract be determined by the law of the state where the contract was made." *Commercial Union Ins. Co. v. Porter Hayden Co.,* 97 Md.App. 442, 451, 630 A.2d 261 (1993), *vacated on other grounds,* 339 Md. 150, 661 A.2d 691 (1995); *see also Allstate Ins. Co. v. Hart,* 327 Md. 526, 529, 611 A.2d 100 (1992); *Bethlehem Steel v. G.C. Zarnas and Co., Inc.,* 304 Md. 183, 188, 498 A.2d 605 (1985). "Typically, '[t]he *locus contractu* of an insurance policy is the state in which the policy is delivered and the premiums are paid.'" *Porter Hayden* at 451, 630 A.2d 261 (quoting *Aetna Casualty & Sur. Co. v. Souras,* 78 Md.App. 71, 77, 552 A.2d 908 (1989)). Here, the policy was procured by an Annapolis broker for a vessel harbored in Annapolis. Moreover, all of the premiums were paid by appellee to JMA in Annapolis. Clearly, Maryland regulations control.

In sum, we conclude that the provisions of COMAR 09.30.32 applied to the policy insuring the *Serefe.* When CIGNA

issued a binder and a policy for the 1994–1995 "renewal year", it was obligated by COMAR 09.30.32.02 to notify Dr. Zeitler that the terms of his "renewed" policy had changed. The remedy for a violation of that section is that "the policy with adjustment in premium shall be treated as being in effect without the change or reduction in coverage . . . when a claim occurs which is affected by the change." COMAR 09.30.32.03. Accordingly, the court did not err in instructing the jury as to the requirements of the regulation, nor did it err in allowing the jury to consider breach of contract and negligence claims flowing from CIGNA's breach of that section.

### III.  Appellee's Failure To Read the Insurance Binder and the Policy

It was uncontroverted at trial that Dr. Zeitler did not read the 1994–1995 insurance binder or policy until after he submitted his claim to CIGNA. Both CIGNA and JMA contend that, as a matter of law, appellee's failure to read the policy precluded the court from submitting negligence or breach of contract claims against them to the jury. In their view, the failure to read the policy constituted contributory negligence and acceptance of the terms of CIGNA's offer to insure the vessel on the terms provided in the 1994–1995 policy. For the reasons that follow, we do not agree.

On three occasions, this Court has addressed the question of whether failure to read an insurance policy precludes an action by an insured against an insurance broker or the company that issued the policy. As the outcome of the case depends in large part on our interpretation of those cases, we shall discuss them at some length.

In *Twelve Knotts Ltd. Partnership v. Fireman's Fund Ins. Co.*, 87 Md.App. 88, 589 A.2d 105 (1991), we announced the "Twelve Knotts" rule, which appellants claim precludes appellee's recovery in this case. In that case, twelve children of Henry J. Knott formed a limited partnership in order to manage real estate held by each of the limited partners. *Id.* at 91, 589 A.2d 105. "Operational control" of the partnership was vested in a committee of four partners and an executive

director. *Id.* When the partnership's various insurance policies were about to expire, the committee instructed the executive director to "prepare a request for proposal to solicit replacement policies." *Id.* at 92, 589 A.2d 105. The request for proposal made clear to bidders that the partnership wanted a three year policy at a price guaranteed not to increase during the three year period. Four insurance brokers responded to the request. The committee chose to accept the bid of Commercial Lines, Inc., which was 35% lower than its competitors. The proposal submitted by Commercial Lines to Twelve Knotts included a notation that the annual premium was guaranteed for three years, and the president of Commercial Lines represented to Twelve Knotts's executive director that the price would not increase.

Upon being notified that it had won the bid, Commercial Lines issued a binder from the Fireman's Fund Insurance Company ("Fireman's Fund"). Although it stated the amount of the premium, it said nothing about whether the premium was guaranteed over three years. One month later, Commercial Lines wrote a letter to Fireman's Fund, requesting a policy. The letter said:

Please Issue Policy Per Attached App. Annual Prem. To Be 50,432 Payable 4210 1 st And 11 X 4202. Rate for Bldg + Cts. 08, Rents At .044. 3 Yr Rate Guarantee.

The ensuing policy was written by the American Insurance Company ("American"), a constituent of Fireman's Fund. Contrary to the committee's express request, however, the policy provided that unless premiums were paid in advance, the premiums would be calculated according to the company's ordinary rates. *Id.* at 95–96, 589 A.2d 105. Thus, under the terms of the policy actually issued, premiums were not guaranteed over three years. At the end of the first year, American raised the rates dramatically. Thereafter, the partnership sued Commercial Lines, one of it's brokers, Fireman's Fund, and American, alleging, among other things, negligence, breach of contract, and fraud.

At the close of the plaintiffs' case, the trial court granted a motion for judgment as to all counts. We affirmed. Address-

ing the breach of contract claim, the Court noted that the partnership was "a sophisticated business entity having had previous experience purchasing insurance. The offending policy provision is clear and unambiguous." Furthermore, the members of the committee

> had an opportunity when the policy was delivered to discover the provision and, if they chose, reject the policy on the grounds of non-conformance. Unfortunately, they neglected to do so. By receiving the policy and remaining silent until the end of the policy year, appellant is deemed to have accepted the policy with the non-conforming provision in it.

*Id.* at 104–105, 589 A.2d 105. Quoting 12 Appleman's *Insurance Law and Practice* § 7155, we said:

> [W]hen the insured accepts a policy, he accepts all of its stipulations, provided they are legal and not contrary to public policy. Where changes from the application appear in the delivered contract, under a more stringent doctrine the insured has a duty to examine it promptly and notify the company immediately of his refusal to accept it. If such policy is accepted or is retained an unreasonable length of time, the insured is presumed to have ratified any changes therein and to have agreed to all its terms.

*Id.* at 104, 589 A.2d 105. Therefore, we affirmed the court's grant of judgment as to the beach of contract claim. We then applied the same principle to Twelve Knotts's negligence claim against Commercial lines and its broker, stating:

> The impediment to appellant's breach of contract action, just noted, also cripples its action for negligence. Appellant had a duty to read the policy when it was delivered. If, as it now contends, the three-year premium guarantee was a material element, its failure to do so under the circumstances evident here must be regarded as negligent. The negligence claim therefore founders on the shoals of contributory negligence.

*Id.* at 105, 589 A.2d 105 (emphasis added).

We reached a similar conclusion in the recent case of *Liberty Mutual Ins. Co. v. Ben Lewis Plumbing, Heating &*

*Air Conditioning, Inc.,* 121 Md.App. 467, 710 A.2d 338, *cert granted,* 351 Md. 161, 717 A.2d 384 (1998).[9] There, Ben Lewis Plumbing requested bids for workers' compensation insurance, which had been supplied previously by Liberty Mutual. Under the terms of Liberty Mutual's previous policies, it had conducted annual "audits" of Ben Lewis's workers' compensation losses. Based on the results of those audits, Ben Lewis had received a credit on future premium payments. *Id.* at 469–70, 710 A.2d 338. The request for bids was prepared by Sally Fink, an employee of Ben Lewis Plumbing, not by an insurance broker. According to Fink, an important feature of the previous Liberty Mutual policies was that Liberty Mutual would make no additional adjustments after its determination of Ben Lewis's credits. Fink testified that when Liberty Mutual delivered its proposal to her, she asked the Liberty Mutual representative if the proposal was for the same coverage that the company had in prior years. The representative assured her that it was. *Id.* at 470, 710 A.2d 338. But, the representative did not inform Ben Lewis that, unlike previous policies, the new policy provided that insurance premiums could be adjusted pursuant to more than one audit initiated by Liberty Mutual. When Fink received the policy some months after it took effect, she contacted the Liberty Mutual representative and asked again "if there was anything she needed to know about the policy, and was told there was not." *Id.*

Subsequently, Liberty Mutual made negative adjustments to the Ben Lewis account based on a second and third audit of Ben Lewis's insurance use. When Ben Lewis failed to pay the full amount of recalculated premiums, Liberty Mutual instituted suit against Ben Lewis for breach of contract. Ben Lewis counterclaimed for breach of contract, because Liberty Mutual had made a second and third redetermination of premiums due. Although Ben Lewis did not plead negligent misrepresentation in its complaint, it raised the issue of Liberty Mutual's representations in a pretrial motion and argued negligent misrepresentation before the jury. At trial, the

9. *Ben Lewis* was argued in the Court of Appeals on February 9, 1999.

court denied a motion by Liberty Mutual to instruct the jury that Ben Lewis had a duty to read the insurance policy. *Id.* at 472, 710 A.2d 338. The jury found, among other things, that "[Ben] Lewis had proven negligent misrepresentation...." *Id.* On appeal, Liberty Mutual argued that it was error for the trial court to deny its motion to instruct the jury as to Ben Lewis's duty to read the insurance policy.

This Court held that, "[g]iven the existence of the written policy, the court should not have allowed Lewis to proceed on its counterclaim [for breach of contract]." *Id.* at 475, 710 A.2d 338. Concluding that *Twelve Knotts* applied, we said:

As in *Twelve Knotts,* the insured is a sophisticated business entity with previous experience in purchasing insurance. It had an employee whose job it was to determine the types of insurance that were needed and put out requests for bids. Lewis had studied the policy and knew the particular coverage that it wanted, specifically that the insurer was limited to only one redetermination. Notwithstanding this, it failed to read the policy to determine whether it had indeed received that coverage. Finally, it did not even read the one-page letter forwarding the policy which contained on its face, in plain language, the fact that the insurer could redetermine premiums.

*Id.* at 474, 710 A.2d 338.

The case of *Johnson & Higgins of Pennsylvania, Inc. v. Hale Shipping Corp.,* 121 Md.App. 426, 710 A.2d 318, *cert. denied,* 351 Md. 162, 717 A.2d 385 (1998), decided less than a month after *Ben Lewis,* is also instructive. There, we affirmed the general rule established in *Twelve Knotts,* but concluded that "distinguishing factors [took *Johnson & Higgins* ] outside the [*Twelve Knotts* ] rule...." *Id.* at 441, 710 A.2d 318.

In *Johnson & Higgins,* the Hale Shipping Company ("Hale Shipping") contracted with an insurance broker, Johnson & Higgins, to help it acquire appropriate insurance for a new venture in the marine transport business. Prior to its foray into marine transport, Hale Shipping had exclusively been a

trucking company. Edwin Hale, Sr. ("Mr.Hale"), the president of the company, testified that because he had no experience in marine transport, he endeavored to "discover 'a competent group of people' who could advise him on buying barges and tug boats, a law firm and an accounting firm who knew about the marine business, and an insurance broker." *Id.* at 431–32, 710 A.2d 318. Ultimately, Hale Shipping retained Johnson & Higgins. Mr. Hale testified that he reviewed the details of the proposed marine enterprise with Johnson & Higgins, and "came to rely on [Johnson & Higgins] for their advice." *Id.*

Johnson & Higgins acquired insurance for Hale Shipping beginning in 1984. The policies from 1984 through 1987 contained a clause numbered 8(b), which excluded coverage for loss or damage "in connection with cargo requiring refrigeration" unless the "apparatus" used to refrigerate the cargo was inspected by a "disinterested surveyor" prior to each voyage. *Id.* at 433, 710 A.2d 318. Copies of the policy were sent to Hale Shipping, but Mr. Hale testified that he never read them. In 1987, Hale Shipping began to transport refrigerated cargo. To that end, the company chartered a "container ship" called the *Lanette.* In May 1987, Hale Shipping's attorneys notified the company that, in light of a recent federal court decision, Hale Shipping should inspect the refrigeration clause of any insurance coverage related to the *Lanette.* Mr. Hale forwarded the letter to Johnson & Higgins, who arranged to have clause 8(b) removed from the *Lanette* policy. Johnson & Higgins did not, however, remove the clause from Hale Shipping's policies covering barge and tug operations.

In the fall of 1987, Hale Shipping decided to use a barge and tug on the route previously traversed by the *Lanette.* The barge, called the *Boston Trader,* was owned by Hale Shipping; the tug was owned by an independent towing company. Ronald Gartrell, the company's Shipping Operations Manager, notified Johnson & Higgins of the change, and asked it to "make the appropriate changes to the insurance policy". *Id.* at 435, 710 A.2d 318. Gartrell believed, at the time, that "the coverage for refrigerated cargo carried by the *Boston Trader*

would be the same as it had been for the *Lanette.*" *Id.* at 436, 710 A.2d 318. Johnson & Higgins did not, however, ask the underwriter to delete clause 8(b). On September 16, 1987, the *Boston Trader* "arrived in New York with a refrigerated cargo of herring roe, which appeared to have thawed and spoiled." *Id.* at 436, 710 A.2d 318. The insurer denied the claim, because the refrigeration "apparatus" had not been inspected, as required by clause 8(b). Thereafter, the company that owned the spoiled roe sued Hale Shipping. Hale Shipping, in turn, sued Johnson & Higgins, alleging negligence and breach of contract. *Id.* at 430, 710 A.2d 318. "The gravamen of the complaint was that Johnson & Higgins had failed to protect Hale Shipping's interests when it neglected to seek the deletion of [the refrigeration clause]." *Id.* A jury found for Hale Shipping on both counts, and the court denied Johnson & Higgins's motion for judgment notwithstanding the verdict.

On appeal, Johnson & Higgins claimed that Hale Shipping's failure to read the policies from 1984 through 1987, and its failure specifically to ask Johnson & Higgins to delete clause 8(b) from its tug and barge policies, entitled Johnson & Higgins to judgment as a matter of law, citing the *Twelve Knotts* case. *Id.* at 438, 710 A.2d 318. We disagreed. In our view, the company's complete reliance on Johnson & Higgins made the case distinguishable from *Twelve Knotts.* We stated:

> In the present case, Hale Shipping placed a much greater degree of justifiable reliance upon Johnson & Higgins than that placed upon Commercial Lines by the limited partnership in *Twelve Knotts.* In 1984, Hale Shipping conducted an active search for a reputable and knowledgeable maritime insurance broker on whose expertise it could rely to protect its interests as the corporation was entering a new field. Johnson and Higgins held itself out to possess such knowledge and expertise. Ms. Schaefer testified that she knew that Hale Shipping was relying on her expertise when making its insurance decisions. . . . In addition, [Hale's shipping operations manager] had frequent contacts with Ms. Schaefer to discuss Hale Shipping's insurance needs.

In contrast, in *Twelve Knotts*, the limited partnership solicited proposals and chose the insurance policy by merely accepting the lowest bid.

*Id.,* at 441, 710 A.2d 318.

In light of these cases, we take up the question of whether appellee's failure to read the insurance binder and the insurance policy barred his claims against JMA and CIGNA.

## A. The "Twelve Knotts Rule" and the Claims Against JMA

In Maryland, " ' "Contributory negligence is the neglect of the duty imposed upon all [individuals] to observe ordinary care for their own safety. It is the doing of something that a person of ordinary prudence would not do, or the failure to do something that a person of ordinary prudence would do, under the circumstances." ' " *May v. Giant Food, Inc.,* 122 Md.App. 364, 375, 712 A.2d 166, *cert. denied,* 351 Md. 286, 718 A.2d 234 (1998)(quoting *Baltimore Gas & Elec. Co. v. Flippo,* 348 Md. 680, 703, 705 A.2d 1144, (1998)(in turn quoting *Campfield v. Crowther,* 252 Md. 88, 93, 249 A.2d 168 (1969))).

At the outset, we reiterate that, in reviewing a decision to deny a motion for judgment, we must consider the evidence and the inferences in the light most favorable to the non-moving party. "If there is any evidence, no matter how slight, legally sufficient to generate a jury question" the court's denial of the motion will be upheld. *N.B.S., Inc. v. Harvey, supra,* 121 Md.App. at 341, 709 A.2d 162 (citations omitted). Here, the trial court denied the motion, partly because it determined that there was a factual dispute as to whether appellee received a copy of the binder and the policy before the accident occurred. That determination was supported by the evidence.

At trial, Zeitler testified that he "didn't recall" and "couldn't say" whether he received an insurance binder with a renewal application. On cross-examination, Zeitler explained that when he told the CIGNA investigator in the taped interview that he had received a binder, he did not mean that he

received it before the accident——just that it was in the file at the time of the interview.  Zeitler testified:

> I told [the CIGNA investigator] how I received the policy I told him that my secretary sent it to me while I was traveling.  At the time I was not aware where that document came from, whether the insurance company or whether it came from the agent.  I only found out subsequently that that insurance policy was the one which Jack Martin sent me on September 11 [1995], which was after the accident.  And that was the insurance policy I read.

Appellee's credibility was a matter for the jury to assess.  Therefore, the trial court correctly allowed the jury to decide the crucial issue of fact as to whether Zeitler received the policy before the accident.  On that ground alone, appellants' motions for judgment should have been denied.

█ Additionally, we are persuaded that, under the facts attendant here, appellee's reliance on the "renewal application", rather than the binder and the policy, was not contributory negligence as a matter of law, nor was it an acceptance of the terms of the modified CIGNA contract.  *Twelve Knotts* involved a new contract for insurance, solicited from a group of independent insurance providers.  Here, Dr. Zeitler's policy was a renewal of coverage that followed three years of uneventful ritual, in which JMA procured for appellant the insurance that he requested on the renewal application.  In our view, a person of ordinary prudence would have been justified in concluding that the terms of coverage of the 1994–1995 policy were, in all material respects, the same as the previous year.  In that regard, Dr. Zeitler's position in the case *sub judice* is more akin to that of Hale Shipping than the insureds in *Twelve Knotts* or *Ben Lewis*.

That Dr. Zeitler was a chief executive officer of a corporation, and had procured insurance for his boat in the past, does not undermine our conclusion.  Appellee channeled all of his marine insurance needs related to the *Serefe* through JMA.  Moreover, each year appellee received an application and a cover letter from JMA, and each year he reviewed the application, signed it, and submitted premium payments.  By all

indications, the policy appeared to be a "renewal." The navigational warranty on the 1994–1995 application was identical to the one on the previous year's application. Indeed, considering JMA's repeated references to renewals, there would have been no reason for Dr. Zeitler to suspect that the policy actually procured was anything other than a renewal. Even a "sophisticated" person with previous experience in purchasing insurance could have concluded that, absent notification to the contrary, the insurance requested on the application was the insurance that was obtained. Like the insured in *Johnson & Higgins,* appellee expected his broker to notify him if the new coverage was somehow different than the old.

Even if appellee had reviewed the insurance policy, the discrepancy regarding the dates of coverage would not have been immediately apparent. The navigation warranty is on page 3 of a 9 page policy. The important portion——the date restriction——is buried in the middle of the paragraph.

JMA distinguishes *Johnson & Higgins* by pointing out that "[t]here were no frequent calls by Dr. Zeitler to Jack Martin regarding insurance coverage." But, that observation only underscores appellee's reliance on JMA's annual renewal procedure. The renewal application constituted the sum total of Dr. Zeitler's direct involvement in the process. Thus, JMA's assertions each October as to the scope of coverage were, from Dr. Zeitler's perspective, all the more important.

Like *Johnson & Higgins,* we conclude that appellee "placed a much greater degree of justifiable reliance upon [JMA] than that placed upon Commercial Lines by the limited partnership in *Twelve Knotts." Johnson & Higgins,* 121 Md.App. at 441, 710 A.2d 318. Accordingly, "the trial court correctly concluded that [JMA] had not been contributorily negligent as a matter of law and that the breach of contract claim was not barred." *Id.*

**B. The "Twelve Knotts Rule" and the Claims Against CIGNA**

In light of our earlier conclusion that CIGNA was bound by COMAR 09.30.32.02 to notify appellee of the new terms in the

policy, the *Twelve Knotts* rule as it relates to CIGNA's liability requires little discussion. CIGNA argues that appellee's failure to read the policy constituted an acceptance by Dr. Zeitler of the terms of the pleasure-craft policy. In CIGNA's view, the JMA application never constituted a valid contract, because it was never accepted by the insurer. *See Couch on Insurance* 3d (1997) § 29:16 through 19 (discussing the requirements for offer and acceptance of a renewal policy, and stating that "[i]n order for the renewal of an insurance policy to be effective, there must be an offer to renew and an acceptance thereof."). Under CIGNA's analysis, the pleasure-craft policy was a counter offer, which appellee accepted by his silence. Therefore, CIGNA cannot be liable for breach of contract, because its conduct conformed to the provisions of the only contract in effect between CIGNA and Dr. Zeitler. Logically, CIGNA's position is compatible with a finding that JMA is liable for negligence. If CIGNA is correct, Dr. Zeitler's damages are a direct result of the fact that he was unwittingly lulled into accepting the terms of a policy that did not meet his needs.

■ Even if, *arguendo,* CIGNA's contract analysis is correct, it does not follow that CIGNA was entitled to judgment. Appellee's "acceptance" of the pleasure-craft policy did not relieve CIGNA of the duty to inform Dr. Zeitler that the renewed policy contained a reduction in coverage, pursuant to COMAR. As we noted, the remedy for a violation of that provision is to hold the insurer to the terms of the previous year's policy. In this case, then, *Twelve Knotts* is not dispositive; by regulation, CIGNA was bound by the 1993–1994 navigation warranty.

In sum, we conclude that neither CIGNA nor JMA was entitled to judgment as a matter of law because of appellant's failure to read the policy or the insurance binder. The matter was properly submitted to the jury.

**JUDGMENT AFFIRMED. COSTS TO BE DIVIDED EQUALLY BETWEEN APPELLANTS.**